[No. A035010. First Dist., Div. Four. May 2, 1989.]

SAN FRANCISCANS FOR REASONABLE GROWTH et al.,
Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants
and Respondents;
201 SPEAR STREET ASSOCIATES, Real Party in Interest and
Respondent.

**COUNSEL**

Sue C. Hestor and Herb Schwartz for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General,

and *Gail Ruderman Feuer,* Deputy Attorney General, as Amici Curiae on behalf of Plaintiffs and Appellants.

*Louise H. Renne,* City Attorney, *Judith A. Boyajian* and *Melba Yee,* Deputy City Attorneys, for Defendants and Respondents.

*Pillsbury, Madison & Sutro, Walter R. Allan, Ronald E. Van Buskirk* and *Karen J. Riley* for Real Party in Interest and Respondent.

## OPINION

**ANDERSON, P. J.**—Appellant San Franciscans for Reasonable Growth (SFRG) and others[1] appeal from the superior court's order discharging its peremptory writ of administrative mandamus which directed respondent[2] City and County of San Francisco and its administrative bodies to prepare a supplemental environmental impact report (EIR) in compliance with the California Environmental Quality Act (CEQA)[3] and the state guidelines[4] on the 201 Spear Street project. In addition to requiring the supplemental EIR (SEIR), the writ commanded the Commission to reconsider its prior approval of the project. The Commission reaffirmed its earlier resolution approving the permit for the project without imposing any additional mitigation measures. After pursuing its administrative remedies below and seeking to overturn the Commission's actions in superior court, appellants now challenge the legality of the Commission's reapproval in light of certain exactions for (1) child care facilities, (2) open space and parks, and (3) affordable housing legislated for new developments pursuant to City ordinance Nos. 358-85[5] and 414-85.[6] We affirm.

---

[1] Appellants herein are SFRG, Citizens for Rail California and Peninsula Commuters Action Committee.

[2] Respondents herein are the City and County of San Francisco (City); the City Planning Commission (Commission); the City Department of City Planning (Department); the Board of Permit Appeals (Board) and real party in interest 201 Spear Street Associates.

[3] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

[4] Title 14, California Code of Regulations, section 15000 et seq., hereafter "Guidelines."

[5] Ordinance No. 358-85, "Office Affordable Housing Production Program" (OAHPP), added section 313, entitled "Housing Requirements for Office Development Projects," to the City Planning Code, effective August 18, 1985.

[6] Ordinance No. 414-85, "Downtown Plan," was effective October 17, 1985.

## I. BACKGROUND

### A. *Procedural History*

201 Spear Street Associates has sponsored construction of an 18-story office tower at Spear and Howard Streets in downtown San Francisco; the building consists of 256,800 gross square feet of office space and 5,200 square feet of ground level retail space. The Commission first approved the building permit application in 1982 and the following year the Board denied an appeal attacking issuance of the permit. SFRG sought a writ of mandate compelling the Commission to set aside its certification of the final EIR (FEIR) for the project and to void the building permit. The trial court entered judgment upholding the actions of the City and its administrative bodies. On appeal to the First District Court of Appeal appellants challenged the propriety of the City's methodology in analyzing the cumulative impact of downtown growth.

Meanwhile, the First District reversed judgments in four parallel cases with similar facts and remanded with directions to issue a writ of mandate requiring the Commission to redraft the FEIR's in compliance with CEQA. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61 [198 Cal.Rptr. 634] [hereafter *SFRG* v. *CCSF*].) In its decision the reviewing court concluded that the FEIR's in question were legally inadequate because the City limited the data base for its cumulative impact analysis to approved but not yet constructed projects, thus ignoring projects under environmental review, with the result of understating true impacts of new downtown development. (*Id.,* at p. 72.) The City used the same methodology in preparing the 201 Spear Street project EIR.

In light of the *SFRG* v. *CCSF* opinion, the parties to this litigation stipulated to vacate the superior court judgment and remit the case for reconsideration and further proceedings on the issue of cumulative impact analysis. This court entered an order consistent with the stipulation. Thereafter, the superior court issued a peremptory writ of administrative mandamus commanding the City and its agencies to (1) vacate certification of the FEIR and prepare an SEIR; (2) review the SEIR for completeness and accuracy and, if found to be complete and accurate, so certify the report in compliance with CEQA; (3) reconsider its prior approval of the project, including mitigation measures, in light of the FEIR and new information in the SEIR and then affirm, modify or vacate the approving resolution; and (4) cease further issuance of temporary permits of occupancy until further court order.

In response to the writ the Department drafted the SEIR. Following public comment, the Department responded to the comments and then prepared the final SEIR, which the Commission certified as being in compliance with CEQA. Thereafter, the Commission reconsidered and reaffirmed its resolution approving the building permit for the project. The City then filed its return to the writ, appellants moved to set it aside, and the superior court denied the motion and ordered the writ discharged. This appeal followed.

### B. *Adoption of Downtown Plan and Housing Ordinances*

In 1983, well in advance of preparation of the SEIR for the Spear Street project, the Department issued its growth management plan for downtown San Francisco, commonly referred to as the "Downtown Plan." The plan was subjected to environmental review by means of the Downtown Plan FEIR, certified in October 1984. Concurrent with this downtown planning activity, the City adopted two ordinances germane to this appeal:

(1) *OAHPP Ordinance and Predecessor Legislation*: In the early 1980's, the Department began formulating guidelines for a new "Office/Housing Production Program." The purpose of this program was to ensure that developers of new office buildings, as employment generators, shared responsibility in increasing the City's housing stock, particularly affordable housing. These guidelines, as revised by the Department and adopted by the Commission in January 1982 (Interim Guidelines), were in effect when the Commission initially approved real party's permit application in November 1982.

The OAHPP Ordinance replaced the Interim Guidelines in the summer of 1985. The board of supervisors prefaced the ordinance by declaring that the supply of housing units had not kept pace with the demand for housing created by new employees attracted to the City by large scale office development. As a solution, it concluded: "The City should impose requirements on developers of office projects designed to mitigate the adverse effects of the expanded employment facilitated by such projects. . . . It is desirable to impose the cost of the increased burden of providing housing necessitated by such office development projects directly upon the sponsor of new development generating the need . . . ." (City Planning Code, § 313, subd. (b).)

Under the OAHPP Ordinance, the sponsor of any office development project proposing the net addition of 50,000 or more gross square feet of office space must fulfill a formulaic housing unit requirement by constructing affordable housing and/or contributing to a fund for such housing. (City

Planning Code, § 313, subds. (d)-(g).) However, the OAHPP exempted from these provisions any projects previously approved by the Commission, and further provided that if the Commission's action "is thereafter modified, superseded, vacated, or reversed by the Board of Permit Appeals, the Board of Supervisors, or by court action in a manner affecting the amount of housing required under the Interim Guidelines, the permit application on remand to the Planning Commission shall remain subject to the Interim Guidelines." (City Planning Code, § 313, subds. (c)(2)(E) and (F).)

(2) *Downtown Plan Ordinance*: The Downtown Plan Ordinance extensively revised the City Planning Code to facilitate implementation of the Downtown Plan. Among other features, this ordinance required developers of downtown office projects to contribute $2 per square foot to a "Downtown Park Special Fund" and to construct on-site child care facilities or contribute an in lieu fee of $1 per square foot to an "Affordable Child Care Fund." (City Planning Code, §§ 139, 315.) In addition, downtown developers must donate a specified amount of on-site open space. (City Planning Code, § 138.)

In exacting park and child care fees, the City recognized that continued downtown office development would (1) increase the need for additional park and recreation facilities in the downtown area (City Planning Code, § 139, subd. (a)), and (2) increase the need for affordable child care for households of low and moderate income (City Planning Code, § 315, subd. (b)). Again, the ordinance exempts from these provisions any project that has already received at least one approval from the Commission as of the effective date; these projects would continue to be governed by provisions in effect at the time of such approval. (City Planning Code, § 175.1, subd. (b).) However, the ordinance also placed these exemptions under strict time limits. The exemption for this project would have expired 24 months from the Commission's first hearing after remand from this court. (City Planning Code, § 175.1, subd. (c).) Further, the child care requirement provisions appear to provide a blanket exemption for projects approved by the Commission prior to October 17, 1985.[7]

### C. *The SEIR and Project Reapproval*

In conducting its cumulative impact analysis for the 1985 SEIR, the City used two alternative approaches for estimating future transportation, air quality, energy and housing impacts: the Downtown Plan EIR forecasts to

---

[7]Specifically, section 315, subdivision (c)(2), of the City Planning Code provides: "This Section shall not apply to: . . . (F) Any office development project approved by the Planning Commission prior to the effective date of this Section."

the year 2000, and the March 22, 1985, list of projects in the greater downtown area. The Downtown Plan EIR forecasts a net addition of 21.7 million square feet of space in all land uses to the year 2000 whereas the 1985 list of cumulative office development (consisting of projects under construction, approved and under formal review) details a net addition of 21.8 million square feet of office and retail space. On the other hand, in the 1982 FEIR, the City based its analysis of the cumulative effects on a list of projects approved or under construction totalling only 9.2 million square feet of additional office space. Despite more than doubling the analytic base for cumulative impacts, the mitigation measures set forth in the SEIR were virtually the same as those discussed in the earlier EIR or required as conditions for 1982 project approval.

No reference was made to mitigation measures deemed necessary and imposed on other projects by the OAHPP. Nor did the SEIR discuss cumulative impacts of downtown growth on open space or child care needs, or the Downtown Plan requirements concerning these matters.

In reapproving the project with no additional housing exactions, the Commission specifically found that the sponsor's compliance with the 233 housing unit requirement imposed under the Interim Guidelines as an original condition of approval, mitigated the project's contribution to cumulative impacts on housing demand "to a level of insignificance." With respect to impacts on child care services and open space, the Commission found that the project was exempt from the Downtown Plan requirements pursuant to section 175.1 of the City Planning Code. Further, the Commission also found that open space and child care facility measures (1) "generally address social and economic issues rather than the physical environmental effects of cumulative downtown development," and (2) such measures were not contemplated "when Project economics were being considered."

On appeal from the Commission's decision to reaffirm its prior approval of the project, the Board affirmed the Commission's actions and findings, additionally noting that (1) the grandfather clause in the OAHPP prohibited the Commission from imposing the housing mitigation provisions of that ordinance on the Spear Street project, and (2) with respect to open space and child care facility conditions mandated by the Downtown Plan amendments to the City Planning Code, it would be fundamentally unfair to subject a project already approved under one set of rules to these new rules.

## II. STANDARD OF REVIEW

 The scope of our review is limited to the question of whether the City's agencies abused their discretion in reapproving the Spear Street

project. (§ 21168; *SFRG* v. *CCSF, supra,* 151 Cal.App.3d at p. 71.) We may find an abuse of discretion if the agencies failed to comply with CEQA and the Guidelines or if their findings are not supported by substantial evidence in light of the whole record. (*Ibid.*; Code Civ. Proc., § 1094.5, subds. (b), (c).) Consistent with this standard, the agency's findings which accompany project approval must be supported by substantial evidence in the record. (Guidelines, § 15091.) The Guidelines define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made is to be determined by examining the entire record." (Guidelines, § 15384, subd. (a).) In applying this standard we may not substitute our judgment for that of the local entity (*El Dorado Union High School Dist.* v. *City of Placerville* (1983) 144 Cal.App.3d 123, 130 [192 Cal.Rptr. 480]), and must resolve reasonable doubts in favor of the findings and decision (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 393 [253 Cal.Rptr. 426, 764 P.2d 278]).

### III. Statutory Framework

The guiding principle of CEQA is the legislative intent that the act shall "be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 390.) The Legislature has stressed its intent that governmental agencies regulate their activities "so that major consideration is given to preventing environmental damage . . . ." (§ 21000, subd. (g).)

As the first step in the environmental review process, CEQA requires the public agency responsible for approving a proposed project[8] to review the project preliminarily (and sometimes conduct an initial study) to determine whether the project may have possible significant effects on the environment. (§ 21082.2; Guidelines, §§ 15060, 15063.)[9] The agency must find a potential "significant effect" if, among other possibilities, the potential

---

[8] The term "project" includes activities such as the Spear Street project involving "the issuance to a person of a lease, permit . . . or other entitlement for use by one or more public agencies." (§ 21065, subd. (c).)

[9] The term "significant effect on the environment" pertains only to "substantial, or potentially substantial, adverse changes in physical conditions which exist within the area . . ." (§ 21151) and which the proposed project will affect, "including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.)

effects of a project are "cumulatively considerable"; the incremental effects of a single project are "considerable" when viewed in conjunction with the effects of past, current and probable future projects. (§ 21083, subd. (b).) The Guidelines define "cumulative impacts" as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.)

If the local agency preliminarily finds that the project as proposed may have significant effects on the environment, CEQA then requires the agency to prepare or contract for an EIR. (§§ 21080.1, 21151.) The EIR is an informational document which the agency must consider prior to approving or disapproving a project. As such its purpose is to provide public agencies and the public with detailed information about potential effects of the project on the environment, and to set forth ways to minimize impacts, as well as alternatives to the project. (§ 21061.)

The Legislature has expressed the policy that when an agency is faced with a project with significant environmental effects, the approving agency has a duty under CEQA to avoid or minimize environmental damage whenever feasible. (§§ 21002, 21002.1, subd. (b); Guidelines, § 15021.) CEQA defines "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social and technological factors." (§ 21061.1)

If specific economic, social or other conditions make alternatives or mitigation measures infeasible, the agency retains discretion to approve the project despite its significant effects, provided the project is otherwise permissible under applicable laws and regulations. (§ 21002.1, subd. (c).) The Guidelines explain that under these circumstances the decisionmaker must balance the benefits of a proposed project against its unavoidable environmental risks; if the benefits outweigh unavoidable adverse effects, such effects may be considered "acceptable." (Guidelines, § 15093, subd. (a).)

Pursuant to the policy set forth in sections 21002 and 21002.1, an agency's decision to approve a project with identified significant environmental effects must be accompanied by findings (and supporting rationale) on each significant effect. (§ 21081; Guidelines, § 15091.) There are three possible findings: (1) the agency has required certain changes or alterations to the project which mitigate or reduce the adverse impacts; (2) responsibility for such changes or alterations rests with another agency which has, or can and should adopt such changes; or (3) specific economic, social or other considerations render mitigation measures or alternatives infeasible. (*Ibid.*) **(3)** The purpose of section 21081 is to set forth "some evidence that the

alternatives or mitigation measures in the EIR actually were considered by the decision making agency and . . . that there be a disclosure of 'the analytic route the . . . agency traveled from evidence to action.' " (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1034-1035 [185 Cal.Rptr. 41].)

## IV. DISCUSSION

 Against this legal and factual framework, we now turn to the CEQA issue presented to this court, namely, whether the Commission abused its discretion in reapproving the project by failing to consider additional mitigation measures in the areas of child care, open space and housing. Appellants contend the child care and open space/park fund provisions of the Downtown Plan Ordinance and the housing requirements of the OAHPP Ordinance represent the City's most contemporary assessment of the appropriate level of mitigation for harmful impacts in these areas resulting from cumulative downtown growth. Thus, they insist the Commission should have independently considered the feasibility of imposing such additional measures on the Spear Street project sponsor rather than "hiding behind" the grandfather clauses in each ordinance. ██ ██ ██ ██ ██ ██ Finally, appellants and amici curiae assert that these grandfather provisions are local legislative attempts to evade state-mandated CEQA mitigation requirements and, therefore, are inconsistent with, and in violation of, CEQA.[10] As such, they argue these provisions are constitutionally infirm under California Constitution, article XI, section 7 which provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with the general laws."

---

[10] Amici curiae additionally attack the sufficiency of the SEIR itself. In this appeal, appellants specifically indicated in their opening brief that they are "not challenging the sufficiency of the SEIR" and are "not asking that it be set aside." Then, in their reply brief, appellants endorse the amici curiae's efforts to present this matter on appeal. Applying the rule that an appellant must show "good reason" for failing to include an issue in his or her opening brief (*Balboa Ins. Co.* v. *Aguirre* (1983) 149 Cal.App.3d 1002, 1010 [197 Cal.Rptr. 250]), we find no such justification here because the opening brief shows not inadvertent omission, but a deliberate decision not to pursue the matter. (*Younger* v. *State of California* (1982) 137 Cal.App.3d 806, 813 [187 Cal.Rptr. 310].) Further, as in *Younger,* we conclude the issue is not rendered reviewable by virtue of the amici curiae briefing. As a general rule " 'amicus curiae must accept the case as it finds it and . . . cannot launch out upon a juridical expedition of its own unrelated to the actual appellate record. . . . "[T]he rule is universally recognized that an appellate court will consider only those questions properly raised by the appealing parties. Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered." ' " (*Id.,* at pp. 813-814.) We find this rule particularly applicable to the present case because appellants initiated the appeal with the express decision *not* to address the very issue later raised by amici curiae.

Respondents counter that (1) the child care, open space and housing exactions address social and economic, not environmental harms and, thus, are outside the CEQA mandate; and (2) in any event the Commission's decisions concerning mitigation measures were supported by substantial evidence and complied with CEQA. We affirm the judgment for a variety of reasons as set forth below.

*Downtown Plan Ordinance*

A. *The Child Care Provisions of the Downtown Plan Ordinance Do Not Relate to Physical Impacts*

CEQA's mitigation requirements speak to substantial, or potentially substantial, adverse changes in the environment, i.e., changes in *physical conditions* within an area. (§§ 21060.5, 21068.) ▮ Economic and social changes resulting from a project are not treated as significant environmental effects (Guidelines, § 15064, subd. (f)) and, thus, need not be mitigated or avoided under CEQA.

▮ None of the planning or decisionmaking documents relied upon by appellants have ever related the need for child care facilities to an environmental impact, let alone a significant one. The project FEIR and the SEIR do not discuss child care at all. The Downtown Plan Ordinance itself relates child care needs to economic and quality-of-life concerns, not physical impacts: "Due to this shortage of child care, employers will have difficulty in securing a labor force, and employees unable to find accessible and affordable quality child care will be forced either to work where such services are available outside of San Francisco, or leave the work force entirely, in some cases seeking public assistance to support their children. In either case, there will be a detrimental effect on San Francisco's *economy* and its *quality of life*." (City Planning Code, § 315, subd. (b), italics added.)

We conclude that project-specific or cumulative impacts on the availability of child care programs are not *environmental* impacts and, therefore, the Commission had no duty under CEQA to condition project reapproval on exactions from the project sponsor in this area. To state it differently, the board of supervisors enacted the child care provisions outside the scope of CEQA. (See *Associated Home Builders, etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847].) ▮ Therefore the local grandfather provisions exempting the project from the child care facility requirements do not conflict with state law (CEQA) and, accordingly, the constitutional challenge fails.

### B. *Open Space and Park Fund Measures*

 ██ Again, the Spear Street EIR's do not identify impacts on open space as a significant environmental effect. CEQA thus did not require measures to alleviate threats to open space as such. Indeed, the preliminary studies for the Spear Street project determined there would be no significant effects on parks or open space.

Nonetheless, appellants assert that open space and park fund exactions are necessary under CEQA to alleviate other identified environmental effects, namely, seismic safety concerns and increased energy consumption. They pinpoint certain findings adopted by the board of supervisors in conjunction with the Downtown Plan Ordinance which they assert identify such exactions as a viable method for abating these environmental harms.

(1) *Seismic safety*: Appellants claim that the City, in the context of adopting the Downtown Plan Ordinance, determined that the open space and park fund requirements mitigate seismic safety concerns. Since the Spear Street FEIR identified seismic hazards as a significant environmental effect of the project, appellants urge that the Commission abused its discretion in failing to consider the wisdom of requiring the sponsor to meet these more up-to-date mitigation standards. We disagree for a number of reasons.

To begin with, the EIR's for the Spear Street project have treated seismic hazards as project-specific effects rather than effects from cumulative downtown growth. ██ We are mindful that upon stipulation of the parties, this court originally remanded the case to the trial court for the sole purpose of conducting further proceedings *on the issue of cumulative impact analysis*. Thus, the scope of the stipulation and order left the actions and findings concerning project-specific impacts untouched. Appellants argue, however, that the writ itself more broadly required the Commission to reopen consideration of the entire project, including all mitigation measures, whether project-specific or cumulative. They base their argument on the writ's command that the Commission reconsider mitigation measures "in light of the FEIR and any new information in the SEIR."

We think appellants misinterpret the scope of the writ. There is no question that the additional environmental review was limited to cumulative impact analysis. Since the only new data relates to cumulative impacts, the purpose for reconsidering mitigation measures would be to assess whether the revised cumulative impact analysis revealed deficiencies in conditions originally imposed on the project, including those measures discussed in the FEIR. ██ Under this analysis, since the SEIR did not identify any

seismic safety cumulative impacts, the Commission was not duty bound under CEQA to assess additional mitigation measures to reduce seismic hazards.

Secondly, the record does not support appellant's basic premise that the City "determined" that open space and park fund measures lessen seismic hazards. In fact, appellants refer to a finding by the board of supervisors that it was not necessary to officially designate open spaces as "safe zones" for downtown workers after a major earthquake. Rather, the City concluded that in an emergency people would flock to parks and open space areas (including those areas resulting from the open space and park fund provisions of the Downtown Plan Ordinance) on their own and use them as necessary. (Res. 755-85, p. 30, entitled "Downtown Plan Findings.") We fail to see how this finding translates into a suggestion that *existing* open space is inadequate to serve as safe zones in the event of a major earthquake. We find no basis in the record before us for concluding that open space exactions would mitigate significant seismic effects of the Spear Street project—whether cumulative or project-specific; thus, we cannot sustain an abuse of discretion determination on the grounds that the Commission improperly reapproved the project without such exactions. (§§ 21002, 21002.1.)

(2) *Energy*: In support of their argument that increasing open space reduces energy consumption and, thus, the Commission should have considered imposing exactions in this area, appellants again cite to the Downtown Plan Findings and, in particular, the finding that implementation of the park and open space measures would also decrease energy demand in the downtown district. (Res. 755-85, p. 17.)[11] This finding in turn is based on information in the Downtown Plan FEIR concerning general mitigation measures which would alleviate potential energy impacts from any future development. Specifically, the Downtown Plan FEIR explained: "Measures to increase the extent of parks and other unpaved open space areas would also decrease the energy demand in the [downtown area] by decreasing reflection of solar energy onto buildings and by decreasing overall air temperatures in the downtown."

Appellants' reasoning is flawed for several reasons. To begin with, as pertains to the Spear Street project, the Commission's findings with respect

---

[11] Appellants also draw our attention to a discussion in the Downtown Plan FEIR concerning the impact of additional downtown development on certain solar energy applications including passive solar heating and daylighting opportunities. Contrary to appellant's assertion, this discussion does *not* advocate increased open space to expand these applications. Rather, it comments that the Downtown Plan, "by reducing overall building heights, tapering of upper stories, and preserving street-level sunlight access on designated sidewalks and open space, would mitigate this potential impact to some extent."

to energy impacts are supported by substantial evidence in the record and we may not overturn them on appeal. (§ 21168.) In reaffirming its approval of the project, the Commission found that nothing in the SEIR altered their earlier finding that contributions of this project to cumulative impacts on energy use had been mitigated *to a level of insignificance* by prior conditions imposed on the project as part of its original approving resolution. The Commission further pointed out that the SEIR did not disclose any cumulative impact of the project which were exponential in their effect, "i.e., which are disproportionately high for the Project as opposed to the degree of impact from other future projects."

The record supports these findings. The SEIR concluded that electrical demand from the project would be between 1.1 percent and 2 percent of the demand from downtown development, while demand for natural gas would be between .1 percent and 1.1 percent of overall demand. Incorporated into the project is an energy consumption reporting condition with a kicker: if consumption exceeds energy use projections contained in the FEIR, the project must undergo an energy audit and the sponsor would be obligated to implement certain conservation measures reflected therein. Further, the project must comply with California building energy conservation standards. As explained in the Downtown Plan FEIR, new structures built according to these standards are more energy efficient than the older, relatively energy inefficient buildings which will probably account for most of the future energy demand in the downtown area.

We think the reasonable inference from this information is that the project has contributed its fair share to mitigating the cumulative effects of downtown growth on energy demand by (1) complying with current energy standards and (2) subjecting the project to possible future revision to maintain a permissible level of energy performance. (Guidelines, § 15384, subd. (a).)

Secondly, the Commission's duty to condition project approval on incorporation of feasible mitigation measures only exists when such measures would "substantially lessen" a significant environmental effect. (§ 21002; Guidelines, § 15021, subd. (a)(2).) Thus the agency need not, under CEQA, adopt every nickel and dime mitigation scheme brought to its attention or proposed in the project EIR, let alone proposed in some other EIR. We think the energy/open space mitigation connection discussed in the Downtown Plan EIR is more of a band-aid approach to reducing energy consumption than a substantial solution.

This conclusion finds support in the nonenvironmental impetus for the park fund and open space exactions. The overlapping benefit of increased

open space to reduced energy demands is merely incidental. To illustrate, the findings relating to establishment of the park fund reveal that its purpose was to allow the City to acquire and develop public park and recreation facilities to serve the burgeoning daytime population in the downtown district; in other words, to allow the City to provide amenities that would improve the quality of life of downtown employees and visitors, *not* to obviate environmental harms. (City Planning Code, § 139, subd. (a).) Likewise, it is clear that the open space exactions for plazas, sitting areas, sun and view terraces and the like mandated by the Downtown Plan Ordinance for new developments are designed to provide pedestrian amenities: these requirements "address the need for plazas and other local outdoor sitting areas to serve employees and visitors in the districts." (Ord. No. 424-85, City Planning Code, § 139, subd. (a).)

Finally, appellants ignore the fact that the project has *already* contributed to landscaped open space in the downtown area by providing a street level landscaped plaza, two roof terraces and a pedestrian way.

██ Because the project's contribution to cumulative energy impacts was insignificant and its contributions to seismic impacts was nonexistent, the Commission had no duty under CEQA to consider the feasibility and availability of additional remedies to further abate environmental damage in these areas. (§§ 21002, 21002.1.) Thus, we need not determine whether the City impermissibly "hid" behind the Downtown Plan Ordinance grandfather provisions which exempted this project from the open space and park fund provisions; nor need we decide whether the grandfather provisions are constitutionally infirm. ██ However, were we to face these issues with respect to the Downtown Plan Ordinance, our conclusions and reasoning concerning both issues would be identical to our conclusions and reasoning set forth below concerning the OAHPP Ordinance: namely, (1) the Commission was without authority to override the Downtown Plan Ordinance exemptions or impose any other open space/park-related monetary exactions on the Spear Street project sponsor and, thus, cannot be held to have abused its discretion in honoring the exemptions and (2) the grandfather provisions do not conflict with CEQA.

### OAHPP Ordinance – Housing Mitigation

Appellants point out that the jobs/housing imbalance created by cumulative downtown growth results in increased auto transit which, in turn, affects air quality. Consequently, they argue mitigation of housing impacts will curtail air quality impacts by reducing distances travelled to and from the downtown area. The board of supervisors made similar findings in

connection with adopting the Downtown Plan Ordinance (Res. 755-85, pp. 15, 20), and the Spear Street project SEIR likewise concluded that measures to reduce automobile use and number of vehicle miles travelled would reduce cumulative air quality effects.

■■■ Upon reapproval, the Commission found that the project will contribute to cumulative impacts in the following respects: "an increase in transit ridership and pedestrian and vehicular traffic and parking, violations of total suspended particulate and localized carbon monoxide air quality standards, all as produced by this and other closely related and reasonably foreseeable probable future projects." Based on such a finding, the Commission was duty bound to withhold project reapproval if there were feasible measures available to help avoid this harm. (§§ 21002, 21002.1)

### A. *Factual Background*

The Commission originally conditioned project approval upon satisfaction of a housing requirement calculated under the Interim Guidelines. The SEIR reported that in February 1984 the project sponsor contributed $729,464 to assist in financing a 402-unit apartment project, for which the sponsor received final approval of 233 housing credits under the guidelines.[12] The SEIR then concluded that "contributions of the project to possible cumulative impacts on housing demand have been mitigated to a level of insignificance by measures [i.e., compliance with the Interim Guidelines] required as part of the project approval."

The Commission stood behind this conclusion when it reapproved the project. Upon review of the Commission's decision, the Board further indicated that the OAHPP Ordinance prohibits the Commission from imposing its housing mitigation provisions on the Spear Street project.

### B. *Analysis*

For purposes of CEQA, impacts on housing demand are social and economic effects which contribute in this case to adverse changes in air quality. ■■■■ (See Guidelines, §§ 15064, subd. (f), 15131, subd. (a).)[13] Thus, to the extent this project's contribution to cumulative impacts

---

[12] Under the Interim Guidelines, each bedroom counts as one housing unit, so that a studio or one bedroom unit would equal one unit whereas a three bedroom unit would equal three housing units. Although the Interim Guidelines do not define housing "credit" per se, our reading of the provisions satisfies us that the Department issues housing credits on a per "housing unit" basis.

[13] Appellants argue at length that the Commission abused its discretion in failing to examine the sufficiency of steps taken pursuant to the predecessor Interim Guidelines to reduce

on housing demand is ameliorated, its contribution to air quality impacts will also be reduced. The Commission and Board found that the sponsor's compliance with the Interim Guidelines rendered this project's addition to cumulative impacts on housing demand insignificant. A de minimis impact on housing demand per se would translate into a de minimis impact on air quality. We now examine the record to determine whether this finding is supported by substantial evidence.

Appellants attack the Commission's decision as circular in its reasoning and contrary to CEQA. They argue that the Commission abused its discretion in determining, without further analysis, that fulfillment of an obligation assessed under the Interim Guidelines virtually eliminated housing impacts. Such a conclusory finding, they assert, lacks evidentiary teeth because the only rationale for the finding is that the Interim Guidelines required 233 housing units and nothing more.

(1) *Substantial evidence*: Contrary to appellants' assertion, the 233-unit requirement was not created in a vacuum. The FEIR found that the project would generate jobs for 420 workers with a corresponding demand for approximately 233 additional housing units in San Francisco, as calculated in accordance with the Interim Guidelines.[14] Thus the original 233-unit requirement was reasonably based on the projected number of new workers attracted by the project, divided by the estimated number of workers occupying each unit.

 We are mindful that the findings requirement of section 21081 (see part III, *ante*) places the burden on the approving agency to show affirmatively that it has considered the identified means of lessening the project's significant effects. (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d at p. 1035.) The Commission originally met this burden when it considered and then conditioned project approval on fulfillment of a housing unit requirement determined under the Interim Guidelines. The question then becomes the scope of the Commission's duty following preparation of the SEIR.

Our Supreme Court's decision in *Laurel Heights* is particularly instructive on the issue of how a public agency must approach the environmental

---

*project-specific* housing impacts. As stated above, the writ compelled appellants only to reassess mitigation measures related to *cumulative* impacts; we are, therefore, concerned with housing impacts only to the extent they aggravate cumulative air quality effects. More to the point, project-specific demands for additional downtown housing implicate social and economic, not environmental, concerns and, thus, are outside the CEQA purview.

[14]The Interim Guidelines formula projected 1.8 working adults per each residential unit (420 divided by 1.8 equals 233). The FEIR also made reference to the 1.8 estimate, noting that it derived from a 1979 downtown conservation and development planning program.

planning and approval process the second time around when its original actions have been declared violative of CEQA. Plaintiff sought a writ of mandate vacating the Regents' certification of the EIR for the relocation of the School of Pharmacy at the University of California, San Francisco, as well as their approval of the project. Having found the EIR inadequate under CEQA, the Supreme Court provided the following guidance to the Regents on remand: "We shall not countenance any attempt to reject an alternative on the ground that the Laurel Heights site has already been purchased or the activities there have already commenced. The Regents must begin anew the analytic process required under CEQA. We will not accept post hoc rationalizations for actions already taken, particularly in light of the fact that those activities were begun in violation of CEQA, even if done so in good faith. To do so would tarnish the integrity of the decision-making process required by CEQA. . . ." (*Laurel Heights Improvement Assn.* v. *Regents of University of California, supra,* 47 Cal.3d at p. 425.)

We think the Commission here has discharged its duty to "begin anew" the analytic process. The Commission took a fresh look at the whole question of cumulative impacts, reviewed and considered additional data set forth in the SEIR reflecting slightly higher projections of new employees,[15] and concluded the original mitigations were sufficient. Appellants view the Commission's satisfaction with the status quo of Interim Guidelines' mitigation as an impermissible post hoc rationalization under *Laurel Heights*. *Laurel Heights* does not require more mitigation the second time around if the need is not supported by the new analysis and data. ■ Even given an additional 10 to 45 employees, we think from a numerical perspective[16] the sponsor has met practically the entire housing demand generated by the project—certainly substantial evidence buttressing the conclusion that this project's share of the cumulative housing demand burden was insignificant and additional mitigation was unnecessary.

We also conclude the Commission has fulfilled its obligation under section 21080 to disclose the "analytic route" between raw evidence and decision. (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d at pp. 1034-1034.)

[15] According to the SEIR, the project would attract between 430 and 465 new employees who would reside in San Francisco, accounting for 0.2 percent of all downtown workers living in the city by the year 2000 (or, based on the list-approach methodology, when all projects were built and operational).

[16] See footnote 17, *post,* illustrating that when using the formula contained in the OAHPP Ordinance for applying Interim Guidelines credits against the OAHPP housing unit requirement, the sponsor actually comes out ahead by two units. Appellants have not challenged the legality of the conversion formula.

In reviewing the SEIR, the Commission found that the supplement did not disclose any cumulative impacts of the project which were disproportionately high for the project as opposed to the degree of impact from other future projects. As explained in the SEIR, an individual project contributes to cumulative impacts in proportion to its contribution to employment growth, which is tied to the amount of space provided in the new building. Thus, where mitigation measures are imposed on a per square-foot basis (e.g., as in the case of the Interim Guidelines housing unit requirement), the project will donate its share to overall efforts which combine to reduce cumulative effects of increased downtown development.

The finding of compliance with the Interim Guidelines, coupled with the finding and analysis of no disproportionate contributions to cumulative impacts, sufficiently delineates the rationale for the Commission's decision that the project's contribution to cumulative impacts on housing demand was inconsequential.

■■■ (2) *Validity of grandfather provisions*: Appellants counter that the OAHPP is a legislative determination that developers must provide more, and qualitatively different housing mitigation than required under the Interim Guidelines in order to dilute the adverse effects of expanded downtown employment.[17] Because the writ in effect vacated project approval pending

---

[17] The OAHPP Ordinance requires the sponsor to meet its housing requirement by (a) constructing a specified number of housing units, 62 percent of which must be affordable to households of low or moderate incomes; (b) contributing an in lieu fee to be used exclusively for development of affordable housing; or (c) a combination of the two methods. (City Planning Code, § 313, subds. (d)-(g).) In contrast to the Interim Guidelines, the ordinance defines "housing unit" by way of reference to the definition of "dwelling unit" in City Housing Code section 203.4, namely, "a room or suite of two or more habitable rooms which are occupied or which are intended or designed to be occupied by one family with facilities for living, sleeping, bathing, cooking and eating and having only one kitchen . . . ." (City Planning Code, § 313, subd. (a)(14).) Further, the Interim Guidelines do not have an affordability requirement. Only 20 percent of the housing units produced by the project sponsor were designated "low income."

Respondents assert that if the Spear Street project sponsor were to attempt to comply with the OAHPP standards today, it would satisfy the new quotas regardless of the exemption for projects that had received prior Commission approval. They are technically correct, but only by virtue of another grandfather-like provision allowing for credit against the OAHPP housing unit requirement, *without regard to the 62 percent feature,* for a percentage of housing credits receiving approval under the Interim Guidelines. (See City Planning Code, § 313, subds. (e)(4), (f)(2), (h)(1).)

Specifically, under the City Planning Code, the sponsor of a project which has received final approval for Interim Guideline credits but which has not yet been approved by the Commission can apply 2.3 Interim Guideline credits against each housing unit required under the OAHPP. The conversion factor apparently represents the differences in the "housing unit" concept under the two schemes. For example, a three-bedroom/one kitchen apartment would translate into three units under the Interim Guidelines, but only one unit under the

further environmental review and reconsideration, they argue the Commission was obligated to reevaluate housing demand and mitigation measures with 1985 (i.e., OAHPP Ordinance) eyes, not 1982 Interim Guideline eyes. They accuse the Commission of impermissibly "hiding" behind the grandfather provisions, thereby failing to assess whether diminishing housing impacts to OAHPP Ordinance standards would substantially reduce air quality impacts. They attempt to raise this case to constitutional dimensions by arguing that the OAHPP Ordinance conflicts with CEQA because the exemptions operated to prevent the Commission from applying contemporary mitigation standards which the City had otherwise found to be necessary. We disagree.

(a) *The Commission can exercise only those powers provided by law*: The Commission's duty under CEQA is to condition project approval on available, feasible mitigation measures. (§ 21002.) However, CEQA does not grant independent power to the Commission to mitigate significant environmental effects. Rather, the Commission's duty, as approving agency, is limited to the exercise of "those express or implied powers provided by law other than this division. However, a public agency may use discretionary powers provided by such other law for the purpose of mitigating or avoiding a significant effect on the environment subject to the express or implied constraints or limitations that may be provided by law." (§ 21004.) The legislative findings to this section indicate that the Legislature enacted section 21004 to clarify that CEQA does *not* " 'confer on public agencies independent authority to levy fees, impose exactions, and take other actions in order to comply with the general requirement . . . that significant effects on the environment be mitigated or avoided whenever it is feasible to do so.' "

This complex litigation involves two decisionmakers: the Commission, as the agency responsible for environmental review and approval of the Spear Street project, and the board of supervisors, which enacted the OAHPP Ordinance to address the incremental effects of downtown growth on housing. Presently, developer exactions are available as a mitigation measure only to the extent set by the board of supervisors in the OAHPP Ordinance. As between the Commission and the board of supervisors, the Commission was without authority to override the exemption or to impose any other

---

OAHPP Ordinance. In our case the sponsor would receive 101 credits, to be applied against a housing unit requirement of 99 determined under City Planning Code, section 313, subdivision (d)(1) (256,800 net additional gross square feet of office space $\times$ .000386 = 99 housing units).

In any event, the grandfathering concern remains, whether by an outright exemption or partial exemption from the affordability requirements, and for that reason we address appellants' concern head on.

monetary housing exaction on the sponsor. Its authority was limited to the powers vested in it by the Interim Guidelines and the OAHPP Ordinance, which set housing mitigation at the amount and of the type already rendered. (See fn. 17.) It goes without saying that the Commission did not abuse its discretion by abiding by applicable law. However, this does not mean that the board of supervisors can pass legislation which hamstrings its own or the Commission's power to comply with CEQA. As we discuss below, the OAHPP legislation does not derogate CEQA; it is a reasonable, citywide approach to treating housing impacts resulting from downtown growth.

(b) *CEQA does not mandate a certain level of mitigation across the board for all similar projects*: Nothing in CEQA requires a local legislative body such as the board of supervisors to enact legislation which uniformly applies a certain level or standard of mitigation to all similar projects submitted for environmental review within its jurisdiction. Local entities retain legislative power to devise solutions to diminish environmental damage from future development. Indeed, when cumulative effects are involved, CEQA anticipates that the only feasible mitigation may entail "adoption of ordinances or regulations rather than the imposition of conditions on a project-by-project basis." (Guidelines, § 15130, subd. (c).)

This is precisely what the City has undertaken in enacting the Downtown Plan Ordinance and the OAHPP Ordinance. Both were legislative responses to the phenomenon of downtown growth and its cumulative impacts. Both undertook a two-tiered approach to imposing developer exactions—contemporary measures would apply to future developments; developments which have received prior Commission approval, whether such approval is reconsidered or not, remain subject to prior law.

The Interim Guidelines and the OAHPP Ordinance represent a legislative continuum designed to meet the evolving burden on the housing market due to downtown growth. The guidelines were developed as interim rules pending adoption of an ordinance. They were to apply to projects requiring Commission approval prior to adoption of an OAHPP ordinance. Following a detailed economic study on mitigating housing market impacts in downtown, the board of supervisors enacted the definitive ordinance, with a built-in annual adjustment to the in lieu of fee, as well as periodic review of the housing unit formula. (City Planning Code, § 313, subds. (f)(1), (n).) Appellants cannot seriously question that the board of supervisors was aware of the general consequences to its housing mitigation efforts of exempting development such as the Spear Street project from the new legisla-

tive scheme. With this awareness it created a flexible mitigation tool designed to combat the impacts of continued downtown growth.

Appellants attempt to persuade us that the grandfather clauses represent an impermissible circumvention of CEQA. They cite decisions invalidating the local government's classification of certain permit approval processes as "ministerial acts" and thereby excluding affected projects from CEQA's purview. (See *Day* v. *City of Glendale* (1975) 51 Cal.App.3d 817, 821-824 [124 Cal.Rptr. 569]; *Friends of Westwood, Inc.* v. *City of Los Angeles* (1987) 191 Cal.App.3d 259, 270 [235 Cal.Rptr. 788].) These cases held that the issuance of grading and building permits involved discretionary acts to which CEQA applied. Appellants' reliance thereon is misplaced. This is not a case where the board of supervisors banned an otherwise viable mitigation measure. Under CEQA the choice of how to allocate mitigation of cumulative impacts remain discretionary with the local entity. The two-tiered approach to housing mitigation embodied in the OAHPP Ordinance and its grandfather clause does not conflict with the CEQA mitigation mandate. Rather, it is a reasonable approach to phasing in and refining the appropriate standard on a cumulative basis. The grandfather provision of the OAHPP, like that in the Downtown Plan Ordinance, provides for an "orderly transition"[18] between legislative schemes, and as such represents a reasonable and legitimate exercise of local legislative power.

The judgment is affirmed.

Channell, J., and Perley, J., concurred.

---

[18] The Downtown Plan Ordinance articulates the legislative intent of its grandfather provision: "It is the intent of this section to provide for an orderly transition from prior zoning and planning requirements to the requirements imposed in implementing the Downtown Plan. . ., without impairing the validity of prior actions by the City, or frustrating completion of actions authorized prior to the effective date of such Ordinance." (City Planning Code, § 175.1, subd. (a).) The OAHPP does not contain similar intent language. Nonetheless, the mechanism and effect of both provisions are the same—developers who began under one set of rules are protected from new requirements.