[No. C057083. Third Dist. Jan. 28, 2009.]

CALIFORNIA NATIVE PLANT SOCIETY et al., Plaintiffs and Appellants,
v.
COUNTY OF EL DORADO et al., Defendants and Respondents;
CAMERON PARK VENTURES et al., Real Parties in Interest and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III. through IV. of the Discussion.

1028

COUNSEL

Law Offices of Michael W. Graf, Law Office of J. William Yeates, Kenyon Yeates, Charity Kenyon, J. William Yeates, Jason R. Flanders; Lippe Gaffney Wagner and Keith G. Wagner for Plaintiffs and Appellants.

Louis B. Green, County Counsel, Paula F. Frantz, Deputy County Counsel; Scharf, Brady & Vinding, Michael V. Brady, Blair W. Will; Diepenbrock Harrison and Michael V. Brady for Defendants and Respondents.

Remy, Thomas, Moose & Manley, Andrea K. Leisy and Laura M. Harris for Real Parties in Interest and Respondents.

OPINION

**MORRISON, J.**—California Native Plant Society and others (Society) challenged El Dorado County's approval of a congregate care project, alleging violations of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and El Dorado County's general plan (General Plan), claiming the project will harm two rare plants. The trial court rejected all of the Society's claims and it timely appealed.

In an effort to preserve rare plants and help developers plan projects, El Dorado County (the County) adopted by ordinance a program in which developers in a defined geographic area would pay a rare plant impact fee, and the money collected, along with money from other sources, would be used to create professionally managed rare plant habitats. The program has never itself been reviewed under CEQA, although it is described in the General Plan, which passed CEQA muster with a finding of overriding considerations.

The central issue is whether payment of the impact fee adequately mitigates the environmental impacts—as to plants—of all projects within the relevant area. More exactly, by paying the fee, does a developer establish *entitlement* to a mitigated negative declaration (MND)—as to plants—instead of having to prepare an environmental impact report (EIR)?

The answer is no. As the County's own General Plan EIR, prepared after adoption of the fee program, provides, and as County staff advised the board of supervisors (Board) before it approved this project, the impact fee allows approval of projects within the relevant environmentally fragile area, but does

not eliminate the need to evaluate and address the impacts on plants of a particular project within that area.

The trial court misunderstood the relevance of the fee program and this skewed its evaluation of the evidence submitted against the project. The Society did not have to show that the fee program was ineffective, it had to show the evidence supported a fair argument that the project would have a significant effect on the environment. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927–929 [21 Cal.Rptr.3d 791] (*Pocket Protectors*).) Contrary to the trial court's view, there is substantial evidence in the record to raise a fair argument that the project may have significant environmental impacts on one or more endangered plant species, in particular, *Ceanothus roderickii* (Pine Hill ceanothus or Pine Hill buckbrush) and *Calystegia stebbinsii* (Stebbins' morning glory or cutleaf morning glory or Stebbins' false bindweed). The fact that the witnesses did not frame their opinions as attacks on the fee program does not mean their views were speculative or unfounded.

A comprehensive preservation program funded by impact fees may be a sound or even essential strategy for mitigating some development impacts, and the California Supreme Court, this court, and other appellate courts have held that such fees *may* adequately mitigate environmental impacts. (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2008) Mitigation Measures, § 14.19, pp. 703–704.) But CEQA is focused on "the effects of projects on the actual environment upon which the proposal will operate." (*Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 354 [182 Cal.Rptr. 317].) Thus, to be considered adequate, a fee program at some point must be reviewed under CEQA, either as a tiered review eliminating the need to replicate the review for individual projects, or on a project-level, as-applied basis. This is reflected not only by basic CEQA principles, but by the County's General Plan EIR and by the views of the County's staff in this particular case. Because the fees set by the ordinance have never passed a CEQA evaluation, payment of the fee does not presumptively establish full mitigation for a discretionary project. Further, as we explain, the fee schedule is outdated as a matter of law, as it has never been reviewed as required.

Accordingly, in the published portion of this opinion, we shall conclude the MND should not have been certified and that an EIR is required for this project. In the unpublished portion, we shall briefly address some subsidiary issues for guidance.

The project has not been stayed pending this appeal. That does not moot the CEQA issues and does not prevent adoption of additional mitigation

measures. (See *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888 [92 Cal.Rptr.2d 268] [project completion does not moot CEQA challenge if some effective relief could be granted].) On the other hand, completion of the project may have verified the adequacy of some mitigation measures challenged by the Society, such as whether certain propagation techniques would work. We reverse with directions to the trial court to issue a writ of mandate requiring the County to withdraw the MND and prepare an EIR to assess the appropriate rare plant mitigation measures for this project.

## FACTUAL AND PROCEDURAL BACKGROUND

Background information is necessary to make sense of the facts and procedures directly pertaining to project approval.

### Ecological Preserve Fee Ordinance

In 1998, as a result of long-standing concerns about dangers to native plants, the County adopted the ecological preserve fee program as an ordinance codified at chapter 17.71 of the County Code.

This was an outgrowth of the work done by the County Rare Plant Technical Advisory Committee (Plant TAC), which apparently is now known as the "Plant and Wildlife" TAC. As summarized by County staff: "In 1992, following [a Board] hearing and an informational workshop, the [Board] requested the formation of the [Plant TAC], consisting of members from the development community, various agencies (California Department of Fish and Game, Bureau of Land Management, U.S. Fish and Wildlife Service), El Dorado County planning staff, California Native Plant Society, Center for Sierra Nevada Conservation (formerly Friends Aware of Wildlife Needs), American River Conservancy, and others. This committee was established to identify feasible preserve sites, funding mechanisms, and management strategies for these preserves." (Pine Hill Preserve—A Brief History & Issue Paper <http://www.co.el-dorado.ca.us/bos/wwwroot/Attachments/eadf4302-3c24-473a-bee4-9cc2f2673a84.doc> [as of Jan. 28, 2009].)

The Plant TAC designed a system of preserves, but lacked the ability to create a funding mechanism. The DFG (Department of Fish and Game) obtained a grant from the FWS (U.S. Fish and Wildlife Service) to study the issue and a financial consultant prepared a feasibility study in 1997.

The code defines "rare plants" or "Pine Hill endemics," including *C. roderickii* (hereafter sometimes ceanothus) and *C. stebbinsii* (hereafter sometimes morning glory). (El Dorado County Code, § 17.71.010.)

The code provides: "There are hereby established an ecological preserve mitigation requirement comprised of on-site and off-site mitigation standards and an ecological preserve fee in lieu of such mitigation. The amounts of the fee shall be established periodically by resolution of the Board of Supervisors and shall be based on the formula set forth in this Chapter." (El Dorado County Code, § 17.71.200, subd. A.)

The code defines three areas, 0, 1 and 2, and states:

"Payment of a fee in lieu of ecological preserve mitigation is encouraged in Mitigation Areas 1 and 2. Developments in Mitigation Areas 1 and 2 shall mitigate impacts by exercising one of the following two (2) options:

"1. Pay the appropriate fee in lieu of ecological preserve mitigation for the direct or indirect impacts caused by development on rare plants and rare plant habitat; or

"2. Participate in the rare plant off-site mitigation program." (El Dorado County Code, § 17.71.200, subd. C.)

The fee shall be "reviewed on an annual basis and adjusted as necessary to ensure that the anticipated fees are no more and no less than required for the purpose for which they are collected." (El Dorado County Code, § 17.71.230, subd. B.) In 1998, the County set the area 1 fee at "$885 per dwelling unit equivalent." Despite the requirement for annual review of its efficacy, the County has never reviewed the original fee levels.

A draft report explaining the ordinance states in part that the fee "would be charged 'in lieu' of on-site mitigation that would otherwise be required by the regulating agencies," and in part states that if the program is *not* adopted, "developers in the Rare Soils Area will need to conduct individual biological studies and devise a mitigation plan if rare plants are found on their property. Payment of the ['fee'] will significantly reduce the risk and uncertainty of the current case-by-case individual mitigation."

Adoption of the ordinance was deemed to be categorically exempt from CEQA. (See Pub. Resources Code, § 21084, subd. (a); Cal. Code Regs., tit. 14, §§ 15300, 15313.) Thus, no environmental review was conducted.

### Pine Hill Ecological Preserve

With funds from the fee ordinance and other sources, the County acquired the Pine Hill Preserve, consisting of five units called Cameron Park, Pine Hill, Penny Lane, Martel Creek and Salmon Falls, managed together as one

preserve. "In 2001, a cooperative management agreement for the Pine Hill Preserve in El Dorado County was signed by three Federal agencies (Bureau of Land Management, [FWS], and U.S. Bureau of Reclamation), two State agencies ([DFG] and California Department of Forestry and Fire Protection), El Dorado County, El Dorado Irrigation District, and the American River Conservancy. With this agreement, the signatories agreed to pool their resources to conserve the rare plant species and ecosystems that they inhabit. The primary goal of the Pine Hill Preserve is the preservation in perpetuity of the rare plant species and communities of the western El Dorado County gabbro formation. By separate agreement, El Dorado County and the Bureau of Land Management, have created funding to employ an interim preserve manager . . . ."

Graciela Hinshaw is the current preserve manager, and the project is adjacent to the Cameron Park unit.

## FWS Recovery Plan

In 2002, FWS adopted the Recovery Plan for Gabbro Soil Plants of the Central Sierra Nevada Foothills (Recovery Plan). It discusses six "gabbro plants," including the ceanothus and morning glory endemic to the Pine Hill formation, which is just over 25,000 acres in size, although "isolated occurrences" of the latter plant can be found in some nearby counties. The Pine Hill formation is "distinctly higher" than surrounding land, a feature that contributes to its unique ecosystem. In addition to a number of endemic plants, about "10 percent of the native plant species known from California are represented within this tiny fraction of the State . . . ." Both plants at issue are adapted to periodic fire, that is, their seeds generally germinate after some type of heat treatment; human fire-suppression policies threaten the species because excessive time between fires harms their ability to reproduce.

The Recovery Plan states in part: "Habitat fragmentation and edge effects significantly affect gabbro plants. Habitat fragments are more susceptible to being burned in their entirety, with shorter than natural intervals between fires, relative to larger tracts of habitat. . . . An occurrence of a rare species of *Ceanothus* in San Diego County was extirpated in this manner . . . . Habitat fragments may be too small to protect from being burned all at once. Additionally, habitat fragments may be too small to support viable populations of animals serving as pollinators or seed dispersal agents. . . . [¶] Edge effects, which occur at the interfaces of any two or more habitat types, typically increase with habitat fragmentation and are more pronounced for natural communities bordered by human disturbances. Edge effects reduce the integrity of a site as habitat fragments get smaller." (Citations omitted.)

The Recovery Plan states that research on propagation techniques is needed for both plants.

In response to a comment the Recovery Plan states: "We want to clarify that recovery plans are not regulations or laws. They are advisory documents that are approved by [FWS]. The approval of a recovery plan does not mean that the recovery plan becomes law or is legally binding. An approved recovery plan outlines our best recommendations for tasks that we believe to be required to recover and/or protect listed species."

In another response, the Recovery Plan states that the financial burden on the County is minimized because various state and federal entities contribute toward "acquisition of the plant preserves." As indicated earlier, the 2001 management agreement also pools funds "to conserve the rare plant species and ecosystems," and a separate agreement pays for a professional preserve manager.

County General Plan

In 2004, the County adopted a new General Plan, which in part discusses "Pine Hill Rare Plants," including both plants at issue. It explains that Pine Hill Rare Plants "are restricted chiefly to gabbro-derived soils and are collectively called gabbro soil plants. Gabbro soils have unusual properties derived from the underlying gabbro rock: they are generally red, mildly acidic, and rich in iron and magnesium, and often contain other heavy metals such as chromium." These plants "have been extirpated from a significant portion of their historic range. The remaining habitat is highly fragmented, with many areas providing only marginally suitable habitat."

The General Plan EIR discusses the creation of the preserve program, including the Pine Hill Preserve, and actions leading to the adoption of the ecological preserve fee, which "created a method by which the County raises funds to acquire land from willing sellers to be included in the ecological preserves." As of 2002, "slightly more than 2,900 acres of rare plant habitat had been protected . . ." within the Pine Hill Preserve. The General Plan acknowledges that the Recovery Plan goal was to acquire 5,000 plus acres.

In response to comments, the EIR describes the three areas created by the fee program, which "is projected to generate funds equivalent to approximately 25 percent of the total acquisition cost of the preserve system. State, federal and other local agencies are assumed to participate in acquisitions funding and, have done so. The fee program also generates funds which are deposited into a trust account, the interest from which is used to pay for operations, maintenance and management costs. *Finally, the preserve fee*

*program is required to be revisited periodically to ensure that facts which support the fee calculation remain current.*" (Italics added.)

As stated, the record reflects that the County has not reviewed the fee program since its adoption in 1998.

Elsewhere the General Plan EIR adopts policy 7.4.1.1, by which "The County shall continue to provide for the permanent protection of the eight sensitive plant species known as the Pine Hill endemics and their habitat through the establishment and management of ecological preserves, consistent with County Code Chapter 17.71 [the ecological preserve fee program] and the USFWS's [Recovery Plan]." Despite this policy, the EIR explains that significant unavoidable impacts remain, but no further feasible mitigation measures exist.

Policy 7.4.1.6 provides:

"All development projects involving discretionary review shall be designed to avoid disturbance or fragmentation of important habitats to the extent reasonably feasible. Where avoidance is not possible, the development shall be required to fully mitigate the effects of important habitat loss and fragmentation. Mitigation shall be defined in the Integrated Natural Resources Management Plan (INRMP) (see Policy 7.4.2.8 and Implementation Measure CO-M).

"The County Agricultural Commission, Plant [TAC], representatives of the agricultural community, academia, and other stakeholders shall be involved and consulted in defining the important habitats of the County and in the creation and implementation of the INRMP."

The parties agree that the integrated natural resources management plan (INRMP) does not yet exist. Therefore, although policy 7.4.1.6 states discretionary projects must "fully mitigate . . . important habitat loss and fragmentation," it defines mitigation with reference to a nonexistent standard.

Continuing a lawsuit that had invalidated a prior general plan in 1999, the Society and others challenged the new General Plan EIR, but the disputes were settled while the matter was on appeal. (See *El Dorado County Taxpayers v. County of El Dorado* (Apr. 24, 2006, C051164) [app. dism. per settlement].)

### Congregate Care Project

The County describes the project in part as follows:

"The Project area is part of the former 383-acre Smith & Gabbert property used to create the Cameron Park Pine Hill Preserve unit. Specifically, in 1998, the County amended the General Plan to designate 315 acres of the 383-acre property to the Pine Hill Preserve. [Citation.] The remaining 68 acres . . . was designated for urban development . . . ."

"The Project includes a 35 room full-time Alzheimer's care unit, 140 units of congregate care, 64 duet cottages, and an 8,000 square foot clubhouse on approximately 20-acres. . . . The development includes Palmer Drive, the Marshall Medical Center, Eskaton senior assisted living facility, medical office buildings, and a local retail shopping center."

On July 17, 2006, the County circulated an MND for the project.

In part this included an environmental checklist prepared by the County's project planner, Lisa Burke, who apparently was staffed from a private company known as Pacific Municipal, referred to in the record as PMC. Her review showed that a number of "special status species" were found on the property, including but not limited to the morning glory, an "Endangered" species and the ceanothus, a "California Rare" species. Planned mitigation was to establish a 0.385-acre "on-site Calystegia [i.e., morning glory] Preserve north of the project site, adjacent to the Pine Hill Preserve," transplant "the four" morning glories actually on the site to that preserve, and collect and treat seeds and prepare the preserve to foster that plant species. The developer also had to pay the ecological preserve fee as a mitigation measure, assessed for this project at $135,000.

<u>Planning Commission Hearing</u>

On August 24, 2006, the County's planning commission accepted testimony. Staff explained that the land was currently zoned for 10-acre residential use and the project would divide it into three parcels: One would remain at that zoning level, one would be rezoned to commercial planned development for "the Alzheimer's unit, congregate care units, and the clubhouse," and the last would be rezoned to "limited multifamily residential planned development," "and will contain the duet units." Duets are like duplexes in that they have two living units, but they are on separate lots.

Graciela Hinshaw testified that she was the manager of the Pine Hill Preserve, which was formed by several government agencies and nonprofits and is dedicated to protecting "the rare gabbro soil plants of El Dorado County." Later testimony established that she was "directly" employed by BLM (Bureau of Land Management) but her salary was partly paid by the County. The project's 68-acre parcel is adjacent to the preserve and is "the

largest remaining contiguous habitat parcel in the area." Fragmentation of habitat was of concern. She emphasized the importance of the ceanothus and noted that there was *no* mitigation proposed for the loss of its habitat. Later she suggested that the parcel be considered for addition to the Pine Hill Preserve, which needed adjacent lands to effectively preserve plants.

Pete Trenham, a local "Senior Wildlife Biologist" with FWS, testified there were five plants listed under the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.) (ESA) in the area, and FWS is one of the agencies that formed the Pine Hill Preserve. Two endangered plants had been identified in the report prepared by Sycamore Environmental Consulting (SEC), the morning glory, which occurs mostly on the Pine Hill formation and the ceanothus, which occurs *only* thereon.

As for the former, Trenham did not believe "transplanting four plants to a one-third acre preserve area" was adequate mitigation. He explained that his agency had only just heard about the project and asked that it be "involved in any determination in the future work, looking for mitigation for this specific project and for other projects on the parcel and, . . . in the areas around the preserve." When asked directly by a commissioner what mitigation would be adequate, Trenham replied as follows: "Having just heard about this project in the last couple of days, we haven't had a sufficient amount of time to review the project, and we would need time to review the impacts. And . . . I can't comment on specific . . . recommendations on mitigation at this time. But we would really like to . . . contribute to that discussion."

John Little, the principal scientist from SEC, testified that Trenham's comments did not take into account the plant impact fee. Thus, the adequacy of the impact fee was placed on the record at that time.

Roberta Gerson, chief of the local FWS endangered species program, explained that the reason FWS had not been informed earlier is that there was no "federal nexus" requiring notification to it. She too was concerned that impacts on and only on the morning glory were mitigated, apparently because that plant was also "State listed," giving DFG authority over it: "Therefore, none of the other endangered plants, federally endangered plants, on the property have been discussed. Meaning, for example, the Roderick Ceanothus, which covers the entire area, is basically having no mitigation for destroying those plants."

Gerson also testified, "we have not had successful transplants done of these plants. There is no guarantee transplanting them will work" and the small size of the proposed preserve made it difficult to be effective.

"And . . . it's only for those four [morning glory] plants, which doesn't even begin to address the rest of the endangered species on the parcel.

"So, bottom line, the [FWS] is very concerned. We do believe this is inadequate.

"We see a real problem where obviously, as Steve [Hust] said, we wonder also why [DFG] never got in touch with us. Yeah, we wonder why we never heard about this project until yesterday, although it's because there's no federal nexus, but that still doesn't stop the obligation of the [ESA] and the whole reason all of us got together and became cooperative partners in trying to achieve enough land acquisition so we can have that land base to start managing and start recovering the species so we can move on with, you know, development and everything in El Dorado County."

Thus, Gerson, chief of the local endangered species program branch of the FWS, the federal agency involved in creation of the Pine Hill Preserve, with notice that the impact fee was relied on as mitigation, testified that the mitigation plan was not adequate to *actually save these plants*. Both she and Trenham also testified that their agency had not been notified of the project in time to present more thorough comments. Hust, of the County staff, *agreed* with this claim of lack of notice and added that even when staff wants DFG to consult with FWS, if there is no federal nexus, it does not happen. On appeal the County claims these agencies were notified, citing a February 13, 2006 letter which "cc's" them, but the letter is vague about the project and references other documents which are not attached to the copy in the administrative record; in any event, that does not show the letter was received.

After the hearing, an e-mail "string" on August 30 to 31 shows that the environmental consultant for the project was alerted to the issue of adequacy of payment of fees, that is, whether in the circumstances, payment of fees necessarily mitigated the project to below threshold levels of significance. For example, in an e-mail dated August 30, 2006, Dan Gifford of DFG noted that the "take" permit application did not address the ceanothus: "Although there is no fed nexus for this project, the County thru various policies and cooperative agreements is committed to conserving Pine Hill sensitive plants. The [MND] should be revised to contain mitigation for all affected sensitive [species], not just the ones involved [in the] State take permit." In response, Little took the position that "payment of fees was adequate mitigation."

We note that the trial court wholly discounted Gifford's view on the ground that Gifford thought the project was within the Pine Hill Preserve boundary. The trial court was mistaken in this: Although Gifford had questioned the location of the project, the above section of his e-mail was not dependent on the boundary issue.

Separately, in an e-mail, Hust questioned whether the MND evaluates the entire project and if it does, "how do you account for the adequacy or inadequacy of rare plants impact mitigation relative to EDC program vs. DFG 2081 permit? AND; How do you view the fact that EDC's preserve program is not reconciled with the Recovery Plan—particularly in the absence of a 'no jeopardy' biological opinion?"

A "DFG 2081 permit" is a "take" or "incidental take" permit: It allows the holder to "take," meaning kill or destroy, specified endangered or threatened plants or animals during the course of an otherwise lawful activity, so long as the holder "fully" mitigates the impacts. (Fish & G. Code, §§ 2080, 2081; see *Environmental Protection & Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 506 [80 Cal.Rptr.3d 28, 187 P.3d 888]; *Department of Fish & Game v. Anderson-Cottonwood Irrigation Dist.* (1992) 8 Cal.App.4th 1554, 1561–1564 [11 Cal.Rptr.2d 222].) Because, for California purposes, the morning glory is classified as "endangered" but the ceanothus is classified as "rare," a take permit was required for the former, but not the latter. The ceanothus is classified as "endangered" for *federal* purposes, but the reason for the different treatment is not explained. The permit for this project is not in the record because it was not issued until after the project approval. The trial court properly denied judicial notice thereof, because it was not before the County when it approved the project. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

Hust then sent the developer this e-mail on August 31, 2006: "DFG, FWS, PMC and the Preserve Manager clearly need to discuss plant and plant habitat issues further with Sycamore. Apparently the public review draft MND did not include site plan information which limited DFG's and Preserve Manager's ability to review project. Also, DFG did not consult with FWS RE: Federally listed plants and associated habitat. Further, I understand Sycamore walked the project site with the Preserve Manager the day before the PC meeting and new information was developed but not disclosed to the County, PMC, DFG, etc. . . . So, all of this stuff needs to be discussed and resolved."

An e-mail on September 5, 2006, from John Little, clarified that the project is within the FWS "recovery area for gabbro soil plants" and County "rare plant mitigation zone 1," but is only adjacent to, not within, the Pine Hill Preserve.

In an e-mail on September 7, 2006, Steven Hust replied to Lisa Burke, to clarify an apparent misunderstanding on the part of the project applicant, stating in part: "Yes, I understand that the land use designations were

evaluated by the [General Plan] EIR at a programmatic level. *The [General Plan] still requires the County to coordinate with federal and state agencies concerning the review of development, including site specific effects on bio-resources such as the gabbro plants.* The issue here is that was not done . . . ." (Italics added, original ellipsis.)

We note that Hust was correct as far as the developer's General Plan argument. (See *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 881–882 [274 Cal.Rptr. 720] (*Oro Fino*) ["conformity with a general plan does not insulate a project from EIR review where it can be fairly argued that the project will generate significant environmental effects"].)

On September 8, 2006, Hinshaw sent an e-mail stating several points, and in paragraph 3 she mentions the impact fee as it relates to mitigation of this specific project:

"1. The proposed project is the last single largest remaining parcel in the Cameron Park area where at least five of the eight rare plants of western El Dorado County are found. The proposed project also lies within the recovery boundaries for federally listed plants growing on gabbro soil (USFWS [Recovery Plan] 2002). According to Policy [7.4.1] of the County's General Plan, the County shall provide for the permanent protection of the eight sensitive plant species. The current project focuses on mitigation of only one of the five rare plants ([the morning glory]) present at this time in the project area.

"2. The project[] is building over 20 acres of the 68-acre parcel and the proposed conservation/mitigation strategy is based only over the 20-acres that will be first impacted. A better conservation strategy for the rare plants can be accomplished if it is based on the 68-acre project site, including all [extant] information regarding distribution of the rare plants on the property. In the 40+ acres where building is not proposed at this time, there is a significant population (thousands of individuals) of Stebbin[s'] morning glory. The habitat there is already functional for this population and, as long as the current topography, hydrology, connectivity to the already protected lands (adjacent Pine Hill Preserve) and proper management are ensured, this population should remain viable. A conservation strategy that would include the area with the [extant] large population . . . will make more ecological and economical sense than creating and maintaining a new preserve area for this species.

"3. The County, the regulatory wildlife agencies and the Pine Hill Preserve should pool together resources and discuss with Mr. Pilegaard, the project

proponent, a more favorable conservation strategy for the rare plants. *For instance, the County and the regulatory agencies could waive payment of fees destined to the conservation of the rare plants in lieu of protecting habitat that is already functional* (no removal of species from one place to another, no soil or gradient alteration, etc.) and, if land protection mechanisms such as land acquisition or conservation easements can take place, those options should also be explored by all agencies involved. The Pine Hill Preserve is in the better disposition to help protect the rare plants on gabbro soil (it is in our mission and is everyone's responsibility), by providing management of future preserved areas, especially if they are adjacent to the Preserve lands." (Italics added.)

On September 12, 2006, Trenham sent an e-mail setting out "our initial analysis" of the project, noting "this is not based on the level of analysis we would apply to a consultation where we had a federal nexus; this is a preliminary analysis based on the available data." He explained: "[T]he Cameron Park North unit of the Pine Hill Preserve includes two contiguous blocks of protected land, connected by an undeveloped corridor of privately owned land. *Because of the location of the proposed project, if developed, it will permanently fragment the existing connection between these areas of protected preserve lands. The project will also develop approximately 26 acres of gabbro soil habitat occupied by endangered Pine Hill ceanothus and endangered Stebbins morning glory. This project would create a barrier between the two (small) areas where Stebbins morning glory exists on protected land in the Cameron Park area* . . . . If we were in formal consultation, we would look closely at whether or not the habitat fragmentation and habitat loss resulting from this project rise to the level of a 'jeopardy' for the Stebbins morning glory or other listed species, but for the above described reasons we have substantial concerns about the effects of this project." (Italics added.)

Trenham also explained, "why we consider the original mitigation proposal to be inadequate," namely, the proposed one-third acre "is insufficient compensation" for the loss of habitat, both transplanting the morning glory and trying to grow it from seed are "unproven" methods, and "we do not agree with the recommendation that all natural plant cover be cleared from the proposed preserve area."

The trial court asserted that Trenham lacked "foundation for his expertise to make such assertions," but this overlooks the fact that Trenham was a senior federal biologist.

In an e-mail on September 13, 2006, Trenham stated he had been discussing these points with the applicant, who "seemed very interested [in] the

possibility of getting relief from the $135,000 in fees he would be paying to the county for his project. I did not comment on whether or not I'd recommend any relief from these fees." Thus, Trenham understood the nature of the ecological preserve fees.

In an e-mail on September 15, 2006, John Little outlined a new set of mitigation measures "in response to concerns about the species [i.e., ceanothus] from DFG and [FWS]."

The additional mitigation was later described as:

(1) Dedication of 5.96 acres for a plant preserve, including the 0.385-acre morning glory preserve.

(2) Creation of a ceanothus propagation plan, by which 8,700 cuttings would be taken from the existing 6,700 plants to establish 6,700 plants in the enlarged preserve, with biannual monitoring and annual reporting to the County, DFG and FWS.

On September 19, 2006, County Development Services Department Director Gregory Fuz wrote a letter to Gifford, stating in part that at the planning commission hearing "representatives from [FWS] and [BLM] commented on the environmental document that was prepared for the project. Both agencies felt that the mitigation as proposed in the environmental document was not sufficient. While we disagree with their position, the County has been working with all interested parties to try to address their concerns." Thus, although Fuz did not share the opinions expressed at that hearing, he acknowledged that the agencies had expressed concerns serious enough to warrant attention. Fuz went on to state that the applicant had agreed to new mitigation measures to address those concerns, attached to the letter, and stated that if DFG "does not believe that the environmental analysis with revised mitigation is adequate, please provide the County with specific recommendations . . . prior to the September 26 Board . . . hearing."

Even if the letter was received on the date it was prepared, this gave DFG, and any other interested parties, *one week* to evaluate a new set of mitigation measures.

In a letter to the Board dated September 26, the applicant acknowledged that FWS did not agree that the initial measures were adequate, but dismissed that view because FWS "has no jurisdiction on this project. [¶] In an effort to compromise we have agreed to do additional mitigation far above what is required by El Dorado County. In summary, it includes paying the in-lieu Fee, donating 5.96 acres of land to be included in the Pine Hill Preserve by

way of Boundary Line Adjustment. We have agreed to replant all ceanothus roderickii plants that would have been mitigated by the El Dorado County Fee program. [¶] . . . [¶] This offer of compromise will be withdrawn if any litigation presents itself on this project."

### Board Hearing of September 26, 2006

On September 26, 2006, the Board held a hearing at which County staff member Peter Maurer explained that the "main issue" "is the conflict between the County's adopted Ecological Preserve Rare Plant Mitigation Program and the [FWS] Recovery Plan." Maurer explained that at the planning commission meeting summarized above, FWS raised issues about other plants:

"There is, at this point in time, no federal nexus . . . . However, the General Plan directs us to work with [FWS] in implementing both the County Ecological Preserve Program as well as [the Recovery Plan].

"So we're at a bit of a conflict here between two different programs that are attempting to accomplish the same end, that is, to protect the rare plant species.

"We feel at this point in time that the Planning Commission's action is appropriate, that they have—you know, the mitigation measures that were adopted and—*and the modification of those measures that were incorporated into the project subsequent to that hearing, based on the input from* [*FWS*], provides adequate mitigation for this project from the standpoint of the County's approval of the map and the zone change." (Italics added.)

Thus, the County's own staff viewed the modified mitigation as sufficient *because it included mitigation for the ceanothus*, as requested by the FWS officials who had testified before the planning commission, Trenham and Gerson. Maurer then explained that although the Board received the new mitigation measures *the day before the hearing*, there was no need to recirculate them:

"CEQA requires that if you modify the environmental document subsequent to the circulation period, as long as you held a public hearing and that the revised mitigation is the same as or better than that originally proposed, that you can make those changes without recirculating the document.

"We feel that the proposed change of the project, additional mitigation that's been proposed by the applicant, is superior to that that was originally identified, and so those findings can be made."

The following exchange then took place:

"CHAIRMAN SWEENEY: You—you said that our staff felt these were adequate mitigations. Do I recall correctly that our—our General Plan and our County ordinance code says that because of the area this is in, all they had to do was pay a fee?

"MR. MAURER: *No, that—that's not correct.*

"CHAIRMAN SWEENEY: Explain the difference now.

"MR. MAURER: Because this is in Mitigation Area 1 and it's a discretionary project, they need to do a plant survey in order to determine if there are on-site plants that need to be mitigated.

"In this case, there were. And they have proposed that—those appropriate mitigation [measures].

"CHAIRMAN SWEENEY: So in addition to paying the fee—[interruption omitted]—after they do the plant survey, if they discover something, then they have to tend to that?

"MR. MAURER: *Yes.*

"CHAIRMAN SWEENEY: Okay. That's what I'm trying to get straight.

"MR. MAURER: [W]e have three different mitigation areas—Mitigation Area 0, which was actually identified, ecological preserve areas; Mitigation Area 1, which is a fee that must be paid and a plant study . . . and if there are plants found on the site, then they would need to address that; Mitigation Area 2 is just simply payment of fees." (Italics added.)

The developer testified in part:

"We're in Mitigation Zone 1, which allows for development. . . . [T]he in-lieu fee can cover both, all the direct and indirect impacts of plants. The Calystegia plant, which there's only four on our site, requires the 2081 permit that we're going to obtain from [DFG]. [¶] . . . [¶]

"We felt that we tried to have a compromise between the [FWS] and what the County required us to do in the initial [MND]. And Peter Maurer . . . has indicated our desire to go ahead and offer that up as additional mitigation, to offer a compromise. And I'd like to give a letter . . . that reflects that, as well

as it's covered in the document that Lisa Burke and our staff has worked towards over the last long several months."

Susan Britting testified on behalf of the Society and referenced a letter she had submitted, which apparently had not been received. She was a "professional biologist" and had reviewed the circulated environmental documents. Her main points were that the loss of unique habitat was not adequately analyzed. She added:

"This is especially true since we have mandatory findings of significance . . . when rare plants are affected by projects. And so to have covered this under a negative declaration, given the inadequate analysis, is a serious oversight.

"I would also address that the mitigation measures apply—I realize that I'm probably out of time, but please bear with me, this is an important issue—that the mitigation measures address one of five species that occur on the site and the other four are unaddressed. There is no mitigation.

"I have to admit I haven't seen the memo that Mr. Fuz submitted to you, so I have no idea what that might be. Maybe there is some solution in that memo. I don't know that.

"But based on the review of the documents that are posted on the website, those other four species are not addressed in terms of mitigation measures. [¶] . . . [¶]

"CHAIRMAN SWEENEY: To comfort you some, Sue, the addenda . . . is to take cuttings from the existing 6[,]700 Ceanothus plants and move them into an additional 2,000 cuttings and so on. And perhaps Peter can get some copies made of the document.

"MS. BRITTING: Okay. Thank you. I'm—I'm certainly willing to take a look at that."

Britting then testified the Recovery Plan acknowledged the lack of information about the viability of transplantation as a mitigation measure, and stated that the General Plan requires that the County follow the Recovery Plan, but opined that this project was inconsistent with that plan.

The Board passed a motion of "intent to approve" and continued the matter to October 17, 2006, for findings.

### Board Hearing of October 17, 2006

On October 12, 2006, Fuz sent the Board a letter explaining the new mitigation measures. In part he stated that a fax had been received from DFG

after the prior hearing objecting to the adequacy of the mitigation measures, but stating DFG had not offered "any specific reasons or substantial evidence supporting its reasons for concluding that the MND was inadequate, nor did DFG offer any additional performance objections or mitigation measures as provided by CEQA. [Citation.] Planning staff has considered DFG's letter and drafted a response which concludes that the MND, *as revised to provide for expanded mitigation*, is adequate for the project. An attachment to the letter to DFG was correspondence from 1997 wherein the DFG states they felt the County Preserve system was adequate mitigation for impacts on rare and endangered plants. In addition, the applicant's biologist, Dr. Little, has prepared the attached correspondence further explaining the impact assessment and mitigation requirements for this project in support of the County's conclusion that project impacts will be reduced to less than significant levels." (Italics added.)

The fax referred to by Fuz, dated September 26, 2006, is from Kent Smith, a DFG "Supervising Biologist," and states the project "will impact sensitive plants," and DFG was processing a take permit, which will require the developer to " 'fully mitigate' the impacts of the project," but the "current MND" is inadequate for DFG to evaluate those impacts.

The 1997 DFG letter referred to by Fuz lauds the rare plant preserve system and states in part that "if the El Dorado entities implement the acquisition and maintenance of the entire five-preserve system, the mitigation for these rare plants on these soils will be accomplished." Contrary to the implication in Fuz's 2006 letter, this was not a commitment by DFG not to object to specific projects, nor a concession that the preserve system would fully mitigate the impacts of specific discretionary projects proposed in the future.

On October 16, 2006, Britting submitted a letter on behalf of the Society. She objected to the lack of notice of the new measures and asked that they be circulated for public comment. She opined that even the amended mitigation measures did not "fully mitigate the impacts of the project" on the ceanothus. The transplantation measures were "experimental and not previously tested. Further, the proposal lacks detail on the specific growth requirements of this rare plant, and planting techniques and culturing practices that will be applied to ensure the long term survivorship of the transplanted individuals in the natural environment." She then elaborated on these points, disputing a portion of the amended MND stating that these plants "tend to be short-lived (5–10 years)" and can be propagated by cuttings. Britting's contrary opinion was as follows: "In naturally occurring populations, *Ceanothus* species are known to be long lived with life spans often regulated by the occurrence of fire. Plant ages of 30–40 years and older have been noted in the literature," and she had

personally seen plants "likely to be well over 15 to 20 years old." She explained the likely origin of the mistaken view that the plants are short lived by discussing learned works, and stated, "The failure of the analysis to correctly identify these basic life history and cultural requirements for *Ceanothus* species, in general, indicates a lack of familiarity and knowledge of the genus. Beyond this, there is absolutely no information presented in the [amended] MND that is specific to *C. roderickii* regarding its life cycle or cultural requirements or any discussion about how such information is relevant to a translocation project." She also explained that the lack of information on preparation of the preserve and "what the ongoing cultural practices will be" violated specific DFG guidelines requiring that a viable mitigation plan in part is one that "spells out in detail the technical components of the mitigation plan." Finally, as to CEQA, she explained her view that transplantation of the plant was not shown to be effective in the technical literature, again citing learned works, and therefore the plan was experimental at best.

Britting also objected based on the General Plan, and the fact that the fee structure had not been reviewed as required, despite increases in land values since 1998.

At the October 17, 2006 hearing, Fuz explained that correspondence had been received in response to the mitigation measures, but that he had not heard from DFG.

Britting referenced the letter the Society had submitted. In her view there was no showing that the transplantation effort would succeed. Further, the "eight pages of environmental effects" produced in October represented "a significant amendment to your environmental document," and therefore further public review was called for.

Counsel for the developer stated that there was no need to recirculate the comments because the added mitigation was not needed to bring the impacts to plants to "less than significant" levels. This appears to be predicated on a September 11, 2006 letter elsewhere in the record from that law firm to the developer, discussing under what circumstances an amended document needs to be recirculated.

The project was approved and a "notice of determination" was filed on October 17, 2006. The Board adopted the proposed revised MND, adopted General Plan amendment A06-0003 to adjust the zoning boundary, adopted ordinance No. 4705 to rezone the property, and adopted resolution 336-2006 to amend the General Plan.

In particular, as to CEQA, the Board found: "[T]he substitute mitigation . . . is more effective than the originally proposed mitigation. The revised

mitigation measures increase the area to be preserved as natural habitat from 0.385 acre to 5.96 acres and include additional protections for the Ceanothus roderickii. The proposed new mitigation does not create any potentially significant effect on the environment, because it reduces the amount of area that may be disturbed and does not authorize or require any construction beyond that which was previously considered. Recirculation of the MND . . . is therefore not required . . . ." As to the General Plan, the Board in part found: "The proposed use and design conforms to the General Plan . . . . The project as conditioned and mitigated fully complies with the General Plan policies governing the protection of natural resources, including rare and endangered plants, including but not limited to Policies 7.4.1.1 to 7.4.16. Specifically, the Project is consistent with 7.4.1.1. because the project is conditioned to pay the El Dorado County rare plant mitigation fee for Zone 1 (MM-5), thus fully complying with the County Code Chapter 17.71, which was adopted to 'establish an integrated method of protecting certain rare, threatened or endangered plant species and their habitat . . . and at the same time, to make the development process simple for landowners, who by complying with this Ordinance, may be able to minimize or avoid the more complicated process of crafting individualized mitigation measures for the direct or indirect impacts of the development of their property on these plant species and their habitat.' The project has also been conditioned to create [an] approximately 5.96 acre preserve to be dedicated to [BLM] for use as a preservation area in perpetuity (MM-6), and transplant the existing onsite [morning glory] plants, plant Ceanothus cuttings, and monitor and report to ensure 'no net loss' for the two plant species[,] thereby ensuring the permanent protection of the eight sensitive plant species known as the Pine Hill endemics and their habitat consistent with the General Plan, the County Code, and the [FWS Recovery Plan]."

The Board's quotation about the purpose of the plant impact fee ordinance is not followed by any citation.

## This Lawsuit

On January 12, 2007, the Society filed the instant petition seeking to overturn the project approvals based on alleged CEQA violations and inconsistencies with the General Plan.

The trial court granted the Society interim relief, but it did not post the required bond and we declined to intervene. On August 16, 2007, the trial court denied the petition and on October 2, 2007, the Society timely appealed. We later denied the Society's petition for writ of supersedeas.

## STANDARD OF REVIEW

Our review is the same as that of the trial court; we determine whether the record demonstrates any legal error and whether it contains substantial evidence to support the agency's factual determinations. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709].) We review legal error de novo; we view the evidence and reasonable inferences therefrom in favor of the County. (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1397 [64 Cal.Rptr.3d 79].) The Society must demonstrate error by showing "substantial evidence in the record supporting a fair argument of a significant adverse effect" on plants by this project. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 904 [69 Cal.Rptr.3d 105] (*Porterville Citizens*).)

## DISCUSSION

■ Although the critical question in this case is whether the Society can meet the "fair argument" test (*Pocket Protectors, supra*, 124 Cal.App.4th at pp. 927–929), we first discuss the ecological preserve fee ordinance, and conclude that in the absence of any environmental review, it does not presumptively establish full mitigation for a given discretionary project. Otherwise, any public entity could pass an ordinance listing rates required for a developer to bypass *actual* environmental mitigation. For such a program to satisfy CEQA, it must at some point pass CEQA muster, either at the programmatic level or the individual project level. Further, the County has violated its own ordinance by not conducting annual review of the fee amounts and efficacy of the program, thereby undermining its view that payment of the fee equates to full mitigation.

The trial court presumed payment of the fee fully mitigated the environmental impacts of the project and faulted most of the Society's claims because they were not framed as an attack on the fee program. Properly viewed, there was substantial evidence in the record to support a fair argument that the project would have a significant effect on rare plants, therefore it was inappropriate to certify an MND and the County must prepare an EIR to evaluate suitable mitigation.

Finally, we will reject some of the Society's General Plan arguments and conclude one such argument is not justiciable.

### I.  Ecological Preserve Fee Ordinance.

The Society claimed there was a fair argument that the project would have a significant impact on rare plants despite the mitigation fee. The opposition

in part argued that the preserve fee fully mitigates the environmental impacts to rare plants, thus justifying adoption of a MND. On appeal, the County also argues that although specific mitigation for the morning glory was compelled because of the take permit, because no such permit was required as to the ceanothus, the additional measures for the latter plant were gratuitous and did not have to be circulated.

The trial court reframed (and misframed) the Society's central claim as follows: "Petitioners contend that substantial evidence in the administrative record supports a fair argument that the ecological preserve mitigation fee and ecological preserve program does not mitigate the significant impact on certain rare plants . . . and does not mitigate the fragmentation of areas where these plants grow."

The trial court's analysis flows from its reframing of the issue, and it found most of the evidence speculative because it was not directed at invalidating the fee program. In effect, the trial court presumed that the fee fully mitigated the project. The County defends the trial court's reframing of the Society's claim, and its interpretation of the fee ordinance and evaluation of the evidence.

The County General Plan EIR did not find that the fee "fully" mitigated for discretionary projects and County staff did not read the fee ordinance that way. Neither do we.

Separately, the administrative record shows that the County has ignored a vital component of the ordinance itself, which calls for annual review of the fees developers must pay. The record shows the fee paid in this case is tethered to a 1998 fiscal analysis, while land values have risen (and more lately, fallen) since then, undermining the claim that the fee, as applied to a project approved in 2006, bore a rational connection to the actual impacts of discretionary projects.

We elaborate on these two points separately.

### A.   The Rare Plant Fee Does Not Equate to Full Mitigation

The critical portion of the code states:

"Payment of a fee in lieu of ecological preserve mitigation is encouraged in Mitigation Areas 1 and 2. Developments in Mitigation Areas 1 and 2 shall mitigate impacts by exercising one of the following two (2) options:

"1. Pay the appropriate fee in lieu of ecological preserve mitigation for the direct or indirect impacts caused by development on rare plants and rare plant habitat; or

"2. Participate in the rare plant off-site mitigation program." (El Dorado County Code, § 17.71.200, subd. C.)

"Ecological preserve mitigation" is defined as "[o]n- and off-site mitigation standards that address direct or indirect impacts on rare plants or rare plant habitat and includes the rare plant off-site mitigation program." (El Dorado County Code, § 17.71.010.) "Rare plant off-site mitigation program" means "[a]cquiring and restoring rare plan habitat through the purchase of fee interests or conservation easements of land within a designated ecological preserve," which must equal "1.5 times the number of acres developed," and be done under FWS and DFG guidelines. (*Id.*, § 17.71.010.)

Thus, the text of the ordinance generally supports the County's interpretation, that is, that "in lieu" of the often complex process of acquiring and dedicating offsite habitat to replace disturbed habitat, a developer may elect to pay the fee "for the direct or indirect impacts caused by development on rare plants and rare plant habitat." (El Dorado County Code, § 17.71.200, subd. C.)

But this ordinance does not, without more, exempt subsequent projects from environmental review. The County has no power to craft blanket exemptions to the CEQA statutes and interpretive regulations, nor to pass an ordinance to satisfy future CEQA requirements, absent some CEQA review *as to the ordinance*. (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1525–1526 [258 Cal.Rptr. 267] (*San Franciscans*) [board could not, by enacting mitigation ordinance, "pass legislation which hamstrings its own or the [Planning] Commission's power to comply with CEQA"].)

The only environmental review of the ordinance took place in connection with the subsequent adoption of the County General Plan. Accordingly, it is appropriate to interpret the ordinance consistent with its treatment in the General Plan. The trial court wholly discounted the General Plan on the ground that it was not site specific, but as we explain, it is the lens through which we must interpret the fee program.

A part of the EIR entitled Master Response 20—Pine Hill Preserve Boundaries addressed the fact that lands identified as "Ecological Preserve" in the General Plan alternatives differed from land designated by FWS in the 2002 Recovery Plan as "desired for potential acquisition." The response discussed the events leading to adoption of the ordinance and creation of the Pine Hill Preserve, as we have outlined. It explains that the fee program is "projected to generate funds equivalent to approximately 25 percent of the total acquisition cost of the preserve system" and to provide funds for a trust

account to fund operational expenses, and that other agencies will provide the rest of the needed funds. "Finally, the preserve fee program is required to be revisited periodically to ensure that facts which support the fee calculation remain current." This periodic review, as we have explained, has not taken place. The response discusses the creation of the management agreement formed by several entities (including DFG and FWS). The agreement required the County to maintain the Pine Hill Preserve designation, that is, the five Pine Hill Preserve units, but the County had "no obligation to acquire additional lands identified" in the Recovery Plan.

By General Plan policy 7.4.1.1, "The County shall continue to provide for the permanent protection of the eight sensitive plant species known as the Pine Hill endemics and their habitat through the establishment and management of ecological preserves consistent with County Code Chapter 17.71 [the ecological preserve program] and the USFWS's [Recovery Plan]."

As to this policy the County found in part: "To the extent that this adverse impact will not be eliminated or lessened to an acceptable (less than significant) level, the [Board] finds that specific economic, legal, social, technological, and other considerations identified in the Statement of Overriding Considerations support approval of the Project [that is, adoption of the new General plan,] as modified, despite unavoidable residual impacts."

Thus, the General Plan EIR shows that the mitigation fee ordinance does not cumulatively avoid significant environmental impacts. That is, at the macro level, the ordinance does not avoid the impacts of the General Plan on the rare plant species at issue. But the General Plan also addresses the micro level of impacts. Policy 7.4.1.6 provides in part: "All development projects involving discretionary review shall be designed to avoid disturbance or fragmentation of important habitats to the extent reasonably feasible. Where avoidance is not possible, the development shall be required to fully mitigate the effects of important habitat loss and fragmentation. Mitigation shall be defined in the Integrated Natural Resources Management Plan (INRMP) (see Policy 7.4.2.8 and Implementation Measure CO-M)."

As stated, the parties on appeal agree that the Integrated Natural Resources Management Plan (INRMP) does not exist. And policy 7.4.1.6 does *not* say that the fee ordinance will mitigate impacts of individual discretionary projects. Thus, the General Plan and its EIR do not qualify as a higher tier review and approval on which later individual projects can rely. Instead, as stated in the General Plan policy 7.4.1.6, individual projects that will disturb "important habitats" "shall be required to fully mitigate the effects of important habitat loss and fragmentation."

Thus, *by its own adopted policy 7.4.1.6*, the County, in performing the required CEQA review for its new General Plan, required that disturbance of

"important habitats" be "fully" mitigated. CEQA review did not establish that ecological preserve fees would "fully" mitigate discretionary projects.

Indeed, Peter Maurer so testified at the hearing, as we explained above, and Steven Hust explained as much in his e-mails; thus, the County planning staff does not interpret the ordinance the way the County does on appeal. We agree with Maurer and Hust's interpretation. The County cannot amend CEQA laws or simply declare that an impact fee of such and such amount will mitigate significant impacts, *absent a CEQA* study. Here, no such study was made. The study finding that the fee program *will not mitigate* the impact of adopting the General Plan cannot be used to conclude that the fee *will presumptively mitigate* the impact of an individual, discretionary project.

In-lieu fee programs have been upheld against specific challenges, and such programs may offer the best solution to environmental planning challenges, by providing some certainty to developers while adequately protecting the environment. But in order to provide a lawful substitute for the "traditional" method of mitigating CEQA impacts, that is, a project-by-project analysis, the fee program must be evaluated under CEQA. (See, e.g., *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1024–1028, 1039–1044 [48 Cal.Rptr.3d 544] (*ECOS*) [describing environmental review of a habitat conservation plan funded by mitigation fees, including adequacy of funding].)

The trial court relied heavily on *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*). But in that case *an EIR had been prepared.* The relevant part of the case addressed the treatment of traffic impacts and mitigation. An in-lieu traffic ordinance had been passed "to enable the County to fund improvements to Carmel Valley Road on a 'pay-as-you-go basis' and to avoid a moratorium affecting development within" the relevant area, and a fee schedule was adopted by resolution. (*Id.* at p. 135.) *After an EIR*, the Board imposed in-lieu fee payments *and* required the applicant to install specific physical traffic improvements. (*Id.* at p. 136.) Further, the specific issue on appeal was whether there was an actual traffic construction program in place. The project opponents argued "the in-lieu fees did not readily translate into actual improvements" and were not likely to do so, given the County's history of neglect of traffic improvements and the alleged failure *of the EIR* "to tie the fee mitigation plan to the actual physical impacts of the project on the environment." (*Id.* at pp. 137–138.) The trial court had accepted these claims and invalidated the project approvals. (*Id.* at p. 138.) The appellate court reviewed evidence *in the EIR* and found specific traffic improvement projects "were in place and in some cases construction was proceeding," and therefore concluded that "the traffic impact mitigation fees

were sufficiently tied to the actual mitigation of the impacts of increased traffic." (*Id.* at pp. 140–141.) *Save Our Peninsula* does not hold or imply that all in-lieu fee programs provide adequate mitigation, presumptively justifying an MND.

*Save Our Peninsula* did make the general statement that "Fee-based infrastructure mitigation programs have been found to be adequate mitigation measures under CEQA. [Citations.]" (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 140.) This statement is literally true, such programs "have been found to be adequate" *in specific cases.* But the statement cannot be read broadly to mean such programs are necessarily or presumptively adequate mitigation under CEQA. *Save Our Peninsula* cited two cases in support of its proposition, but neither supports the latter, expansive, reading. *Russ Bldg. Partnership v. City and County of San Francisco* (1988) 44 Cal.3d 839 [244 Cal.Rptr. 682, 750 P.2d 324], upheld application of a transit-impact fee ordinance to projects which had been granted building permits before the ordinance was adopted; the CEQA process had added a condition that the projects participate in future transit-impact funding, therefore no vested rights were violated. (*Russ Bldg.,* at pp. 844–846.) Thus, the only CEQA relevance in the case was that CEQA provided the mechanism which led to the conditions in the permits that had to be interpreted to determine whether vested rights had been impaired. In *San Franciscans, supra,* 209 Cal.App.3d 1502, the project was evaluated by an EIR and a supplemental EIR (SEIR). (*Id.* at pp. 1509–1510.) The developer complied with "Interim Guidelines" that predated housing ordinances by purchasing 233 housing credits. (*Id.* at p. 1521.) The efficacy of that measure *was reviewed in the SEIR,* which demonstrated the reasonableness of the credits for that specific project. (*Id.* at pp. 1522–1523.) Thus, full CEQA review of the housing credit issue was conducted in *San Franciscans, supra,* 209 Cal.App.3d 1502.

We conclude the statement that "Fee-based infrastructure mitigation programs have been found to be adequate mitigation measures under CEQA" (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 140), simply means that such programs, or the specific applications of those programs to a given project, *when reviewed under CEQA,* may provide adequate mitigation.

Other cases stating that fee measures are adequate are consistent with this view. (E.g., *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 363–366 [46 Cal.Rptr.3d 355, 138 P.3d 692] [rejecting university's claim it did not have to pay for mitigation because another public entity would control the money; also, project was subject to an EIR, not an MND].)

In *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173 [30 Cal.Rptr.3d 738] (*Anderson*), an EIR was prepared for a Wal-Mart

Supercenter. We reversed in part the trial court's denial of a petition for writ of mandate, concluding that the project documents did not adequately spell out the mitigation fees for one part of the necessary traffic improvements. We acknowledged, consistent with our views today, that: "Fee-based mitigation programs . . . —based on fair-share infrastructure contributions by individual projects—have been found to be adequate mitigation measures under CEQA. [Citation.] To be adequate, these mitigation fees . . . must be part of a reasonable plan of actual mitigation that the relevant agency commits itself to implementing." (*Anderson, supra*, 130 Cal.App.4th at p. 1188.)

*Anderson* involved impacts assessed in a full EIR, which found specific improvements needed to be made to mitigate the project, including payment of a specific amount of mitigation fees. Like the other cases, *Anderson* did not hold that *any* fee program is necessarily or presumptively "full" mitigation.

Other cases have emphasized that to be adequate the payment of fees must be tied to a functioning mitigation program. (E.g., *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359 [43 Cal.Rptr.2d 170] (*Gentry*) [adequate mitigation depended on condition not circulated to the public and participation in a fee program to which the city was not a party]; *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 727–728 [270 Cal.Rptr. 650] [*after EIR review*, fees for water development found insufficient because there was no discussion of whether purchasable water supplies existed].) But this does not mean that a mitigation program that has never been evaluated under CEQA is presumed adequate, or, as the trial court seems to have assumed, that the only way to avoid such presumption is to invalidate the program.

For an in-lieu fee system to satisfy the duty to mitigate, either that system must be evaluated by CEQA (two-tier approval for later, more specific, projects) or the in-lieu fees or other mitigation must be evaluated on a project-specific basis.

We recognize that this fee program was the outgrowth of a careful process engaged in by many interested parties, and the record contains evidence that it is actually helping to preserve rare plants in the County. But absent any environmental review, one cannot rationally conclude the set fees to support the program will "fully" mitigate the impacts of a particular discretionary project, as required by the General Plan EIR. As explained by County staff, payment of the fee does not obviate the need for project-specific analysis of impacts. Although payment of the fee opens the door to development within the relevant area, payment of the fee does not obviate environmental review.

The County argues that if we adopt this view: "[L]ead agencies would be precluded from relying on any established fee based mitigation program, *no*

*matter how historically effective*, absent preparation and adoption of a fiscal study focusing solely on the fees paid by a particular project. Such an effort would be extremely costly and would defeat the community-wide purpose of in-lieu fee based programs, especially when applied to plant species which occur over a wide geographic range, as here." (Italics added.)

The flaw in this quotation is the part we have emphasized: This fee program has never undergone CEQA review, and a public entity cannot simply declare that such and such a fee will "fully" mitigate the environmental effects of all future discretionary projects absent some environmental analysis.

The County also argues in part that the Society's claim is barred by its failure to exhaust administrative remedies. We disagree. In partial response to an argument made in the trial court, the Society argued that the fee program was not tethered to a habitat conservation plan (HCP) or natural community conservation plan (NCCP), two environmental terms of art. The County objected that such argument was barred by exhaustion of remedies. The trial court declined to resolve the exhaustion issue.

On appeal the County contends: ". . . Appellants claim the MND provided insufficient mitigation because the County's in-lieu fee is not 'tied' to an adequate fee program, namely a HCP or NCCP. [Citation.] This argument is barred because it was not presented to the County prior to the adoption of the MND and approval of the Congregate Care Project."

The County's objection is not well taken. The Society's claim is not so narrow. The passage referred to addresses a regulation that partly provides that an agency shall require an EIR where there is substantial evidence that the project "has the potential to . . . threaten to eliminate a plant or animal community[ or] substantially reduce the number or restrict the range of an endangered, rare or threatened species." (Cal. Code Regs., tit. 14, § 15065, subd. (a).) There is an exception for projects where mitigation is required pursuant to an HCP or NCCP already approved in reliance on an EIR. (*Id.*, subd. (b)(2).) Whether the fee program satisfied that exception was a legal point based on the facts in the record. In comments to the Board, the Society argued that the proposed mitigation was not adequate and that the project violated the General Plan. The Society "fairly apprised the County" of its central claims. (See *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 897–898 [50 Cal.Rptr.3d 799]; cf. *Porterville Citizens, supra*, 157 Cal.App.4th at pp. 909–910.)

## B. The Fee Structure Is Unsound

■ We are troubled by the undisputed fact that the efficacy of the ordinance and its fee structure has never been reviewed. This violates the fee ordinance itself, which states that the fees shall be "reviewed on an annual basis and adjusted as necessary to ensure that the anticipated fees are no more and no less than required for the purpose for which they are collected." (El Dorado County Code, § 17.71.230, subd. B.) This annual review requirement was emphasized in the General Plan EIR. But the record shows that such review is 10 years overdue. During that period of time, land values have fluctuated greatly, making the relationship of the 1998 fee to a current project speculative.

The County dismisses the importance of its inexplicable failing in this regard by observing that entities other than project developers contribute to the ecological preserve fund. That does not change the terms of the ordinance, which is supposed to ensure that *developers* pay appropriate amounts to mitigate the effects of their specific projects, and that the fee program must be reviewed annually to ensure the fiscal integrity of the program. Nor does it change the assumptions stated in the General Plan EIR. Under the County's view and apparent practice, the amount paid by developers diminishes with inflation and ultimately will become but a token. The result is an evasion of CEQA.

Strangely, in defense of the adequacy of the fee program the County quotes a case for the proposition that "we must presume and expect that the County will comply with its own ordinances, and spend the fees it collects on the appropriate improvements . . . ." (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 141.) While we presume any fees collected will be used for the appropriate purposes (see Evid. Code, § 664 [presumption that official duty is regularly performed]), the record shows without contradiction that the County has not complied with the ordinance by reviewing the fees, therefore it is unknown whether the appropriate amount is being collected from developers.

In part in *ECOS, supra,* 142 Cal.App.4th 1018, we rejected a fiscal challenge to the adequacy of a conservation plan, explaining that, "Mitigation fees will be imposed on developers, and these fees will be reviewed annually and adjusted to reflect the actual costs of the Conservation Plan. Unlike the 1997 Conservation Plan [which had been invalidated], there is no cap on the mitigation fees, so the fees can be increased whenever necessary." (*Id.* at p. 1044.) Thus, we agree with the Society that it is vital that the County follow its own ordinance, specifically, that it regularly review the efficacy of that ordinance and its allied fee structure.

Ironically, during the pendency of this litigation land values generally have dropped. But there is no justification for the County's failure to comply with its own ordinance and we cannot presume that the 1998 fees bear any rational connection to what the developer should have paid in this case.

This means that the EIR that the County will prepare must not assume that payment of the 1998 fee is an adequate contribution towards the ecological preserve system.

## II. An EIR Was Required.

We now come to the "fair arguments" test, by which the Society must show that substantial evidence in the administrative record supports a "fair argument" that the project will have a significant effect on the environment. (*Pocket Protectors, supra*, 124 Cal.App.4th at pp. 927–929.)

█ "Since the preparation of an EIR is the key to environmental protection under CEQA—indeed constituting the very heart of the CEQA scheme—accomplishment of CEQA's high objectives requires the preparation of an EIR 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' . . . [¶] . . . [¶]

". . . A 'significant effect on the environment' is defined as 'a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance.' " (*Oro Fino, supra*, 225 Cal.App.3d 872, 880–881, citations omitted, quoting Cal. Code Regs., tit. 14, § 15382.)

An EIR is required where a project "has the potential to . . . threaten to eliminate a plant or animal community[ or] substantially reduce the number or restrict the range of an endangered, rare or threatened species." (Cal. Code Regs., tit. 14, § 15065, subd. (a).) Where the project has mitigation measures "that would avoid any significant effect on the environment specified by subdivision (a) or would mitigate the significant effect to a point where clearly no significant effect on the environment would occur, a lead agency need not prepare an environmental impact report solely because, without mitigation, the environmental effects at issue would have been significant." (*Id.*, subd. (b)(1).)

Our discussion above foreshadows the result here. The trial court concluded that most of the evidence relied on by the Society lacked foundation because the evidence was not specifically tied to an attack on the fee program. Consistently the trial court's rulings found that a speaker or writer

did not explicitly address the impact fee program, and then concluded his or her claims were speculative.

In our view the trial court missed the forest for the trees. The relevant commentators knew about the fee program. They included Graciela Hinshaw, the Pine Hill Preserve manager, a biologist whose salary is partly paid out of the program, whose preserve was bought with funds from the program, and whose operational expenses are paid from a trust fund arising in part from those fees; indeed, at one point she mentioned the possibility of waiving the fees. Pete Trenham and Roberta Gerson are local biologists with the FWS, a federal agency that helped create the management agreement that runs the preserve and which was one of the agencies that served on the Plant TAC, and that prepared the 2002 Recovery Plan; Trenham, too, mentioned the fees. Susan Britting, a biologist, is the Society's president, and the Society was intimately involved in the creation of the Pine Hill Preserve and its management, and was part of the Plant TAC, as the County concedes.

█ These agency biologists, plus the Society's biologist-president, presumably had adequate background and knowledge to support their opinions about the impact of this project on the plants. (See *ECOS, supra*, 142 Cal.App.4th at p. 1042 ["The agencies entrusted with the statutory obligation of balancing the needs of human populations with those of endangered plants and animals are guided by the expertise of their scientific staffs and independent consultants. We cannot supplant their decisions because we find the views of other experts and other policy options more appealing."]; *Pocket Protectors, supra*, 124 Cal.App.4th at p. 928 [fair argument can be shown by "expert opinion if supported by facts, even if not based on specific observations as to the site under review. [Citation.] Where such expert opinions clash, an EIR should be done."].)

As we have said before, we agree that "mere argument, speculation, and unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument." (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 928; see Pub. Resources Code, § 21082.2, subd. (c) ["Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts."].)

But the fact that Trenham, Hinshaw, Gerson and Britting did not explicitly attack the adequacy of the fee program does not mean their views can be dismissed as speculative, for three reasons. First, as we have explained, the fee program does not insulate the project from CEQA review. Second, because, as we have also explained, the critical issue under General Plan policy 7.4.1.6 is whether a discretionary project can be fully mitigated, they had no particular reason to discuss the fee program. Third, the reasonable

inference is that their opinions did not hinge on the viability of the fee program, not that their opinions were formed in ignorance of it.

As for the ceanothus, the evidence shows that the project may impact thousands of plants. One chart in the record shows that up to a third of the total estimated *counted* individuals of this species will be impacted, and although that figure does not include areas where the numbers of plants have not been estimated, still the number of affected plants is significant. What measures were later provided for ceanothus were never circulated for comment and therefore cannot be relied on to dispel the fair argument of significant impact. Moreover, the additional measures included transplanting and propagating thousands of plants, but there is substantial evidence of a fair argument that the techniques for doing so are not sound, or at least have not been shown to be sound, and that the environmental analysis supporting the proposed mitigation measures prepared by SEC is based on flawed scientific data, for example, on a misunderstanding of the life cycle of the ceanothus. As for the morning glory, there is substantial evidence in the record to support a fair argument that transplanting this species, too, is an unproven technique.

Gerson testified, "we have not had successful transplants" of the morning glory. Trenham explained in an e-mail that transplanting it was an "unproven" method, and he was also concerned about fragmentation of habitat caused by the project. Britting testified that even the Recovery Plan indicated there was a lack of data on transplantation of that plant, and her subsequent letter explained that such measures as to ceanothus were experimental; further, the proposal lacked sufficient detail for proper analysis and wrongly characterized that plant as short lived, when her direct experience in the field showed otherwise, indicating the methodology used by SEC to craft its proposal may have been seriously flawed. Preserve manager Hinshaw was impliedly in agreement: In an e-mail she explained that the project would disturb a large area of established plants and it made more sense to preserve them in place than try to create a new area for them.

The Recovery Plan in part corroborated the lack of adequate information on propagation techniques for these two plants. Although the County correctly observes that the Recovery Plan is not a site-specific document, the document contains relevant evidence about these plants.

We do not mean to imply that the views of these biologists were *superior* to those of John Little, the SEC biologist who reviewed the project for the developer, we merely say that their views were adequate to raise factual conflicts requiring resolution through an EIR. "It is the function of an EIR, not a negative declaration, to resolve conflicting claims, based on substantial

evidence, as to the environmental effects of a project." (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 935.) Accordingly, the MND should not have been adopted.

### III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed with directions to the trial court to issue a writ of mandate commanding the County to cancel the MND and prepare an EIR consistent with the views stated herein. The County and real parties in interest shall pay the Society's costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

Davis, Acting P. J., and Cantil-Sakauye, J., concurred.

---

*See footnote, *ante*, page 1026.